**Fred AHRENS et al., Plaintiffs,**

**v.**

**Sheriff Thomas J. THOMAS et al., Defendants.**

No. 74 CV 34–SJ.

United States District Court, W. D. Missouri, W. D.

June 3, 1977.

Order Staying Execution of Judgment June 8, 1977.

Extension of Stay June 16, 1977.

On Motion for Stay Pending Appeal June 24, 1977.

---

3. This is clearly an exceptional case within the meaning of 15 U.S.C. § 1117 making an award of attorney's fees proper.

Hortense Kleitman Snower, Kansas City, Mo., Thomas P. O'Donnell, Larrimer & O'Donnell, Columbia, Mo., Harry F. Swanger, National Juvenile Law Center, St. Louis, Mo., amicus curiae.

Owens Lee Hull, Jr., Pros. Atty., Donald R. Tharp, Asst. Pros. Atty., Platte City, Mo., for defendants.

Ronald L. Roseman, Andrew J. Steinberg, William J. Dittmeier, The Legal Aid and Defenders Society of Greater Kansas City, Kansas City, Mo., for plaintiffs.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND ORDERS GRANTING PLAINTIFFS RELIEF

JOHN W. OLIVER, Chief Judge.

### I.

Final determination of this § 1983 case involving the Platte County Jail was postponed on two separate occasions for different but related reasons. As we shall later state in some detail, circumstances beyond the control of the parties and this Court relating to the complications which have apparently developed in connection with the establishment of a medium security correctional institution by the State of Missouri in Clay County, Missouri, require that the final determination of this case can no longer be delayed. Accordingly, a final judgment and decree in favor of the plaintiffs will be entered closing the Platte County Jail until and unless substantial changes are made in the physical structure and operation of that ancient facility.

For purposes of explanation, it should be stated initially that experience in § 1983 cases involving the conditions of confinement in correctional institutions has demonstrated that the excessively long delays in the final determination of a particular case, occasioned by appeals from district court decisions, have sometimes been avoided by proper timing of procedures leading to an agreed final determination in the district court and the entry of a consent judgment and decree under which conditions in violation of federal constitutional standards would be corrected.

*Goldsby v. Carnes* (W.D.Mo.1973) 365 F.Supp. 395, involving the Jackson County Jail, in which a first supplemental consent judgment and decree was recently entered on March 24, 1977, as reported in 429 F.Supp. 370, and *Glenn v. Wilkinson* (W.D. Mo.1970) 309 F.Supp. 411, involving the conditions of confinement of prisoners on death row in the Missouri Penitentiary, are examples of cases in which proper timing of final determination avoided the necessity of further litigation.

The Court of Appeals' decision in *Finney v. Arkansas Board of Correction* (8th Cir. 1974) 505 F.2d 194, on the other hand, recounts the history of the long-continuing litigation involving the Arkansas prison system. After three separate district court opinions and an earlier court of appeals opinion (the earlier opinions are reported at 300 F.Supp. 825 (1969); 309 F.Supp. 362 (1970), *aff'd* 442 F.2d 304 (8th Cir. 1971); and 363 F.Supp. 194 (1973)), the Court of Appeals for the Eighth Circuit found it necessary once again to remand the case to the district court for the latter court to retain jurisdiction and to grant further relief under the circumstances. *Finney v. Arkansas Board of Correction*, 505 F.2d at 200. Our effort to find the proper timing to reach final determination in this case was consistent with this Court's experience in *Goldsby* and *Glenn, supra*, and was thus undertaken in the hope that the almost endless litigation illustrated by the Arkansas prisons system cases would be thus avoided.

We first delayed final determination of this case after the parties had filed their respective post-trial suggested findings of fact and conclusions of law in July, 1976. Everyone concerned knew at that time that the voters of Platte County, Missouri would be afforded still another opportunity to approve a bond issue for the construction of a completely new Platte County Jail.

Although at least six different bond proposals for a new jail had been defeated at

the Platte County polls over the past ten years, we believed that appropriate considerations of general comity required that we delay the final determination of this case until after the bond election was held. While an initial plan would have put the jail bond proposal on the August primary election ballot, the Platte County officials eventually decided that the jail bond proposal should not be submitted until the November, 1976 general election.

The passage of the bond proposal at the November, 1976 general election presented an entirely new factual situation, particularly in regard to what remedy might be appropriate under the new circumstances. For it was clear that after the passage of the bond issue, no one anticipated that any of the existing facilities would be permanently used for the housing of inmates for any purpose. The attention of the Court and counsel was therefore directed to a consideration of determining how inmates were to be handled until a new jail was constructed and to appropriately review the construction plans and specifications for the new facility in order to make certain that the new jail would be constructed and maintained in accordance with constitutional standards.

The second reason for delay in final determination became apparent during the course of carrying out the procedures required by the passage of the bond issue. It then became a matter of public knowledge that an earlier aborted attempt by the State of Missouri to build and maintain a medium security correctional institution in the Greater Kansas City area was being revived by the newly elected Governor of Missouri. The available reports of progress, which indicated that the revived effort would be successful, occasioned the second delay in our final determination of this case.

The pending litigation, earlier litigation in connection with State penal institutions and other county jails in Missouri which has pended in this Court, and the testimony of Dr. George Mallory Camp, who at the time of trial was the Deputy Director of the State of Missouri's Division of Social Services, with primary responsibility for direction of the State of Missouri's Department of Corrections, have required this Court to become more than ordinarily familiar with the long-neglected problems of both State correctional institutions and various county jails in this State. Dr. Camp testified that:

I think that the Platte County Jail situation has to be looked at not only in and of itself, but it has to be looked at as a part of the problems of jails in Missouri as a whole. . . . The Missouri General Assembly for the last four years, I believe, has had before it one form or another a bill known as the Minimum Jail Standards Bill. I think that if the legislation as originally drafted or as partially amended when it had some teeth and guts in it had been passed by the General Assembly and signed into law, we might not be sitting here today. . . . The Legislative Branch of the government has abdicated its responsibility to act and has in essence . . . forced the Court to enter into an area or areas where in the past [the public has] relied upon the Executive and Legislative Branches of government . . . to adequately interpret the law and abide by the Constitution. It seems to me that in the case of the Platte County Jail, had there been minimum standards, had there been statewide inspection of jails, had the State as a whole, the State government, worked more closely with county government to assist them . . . in providing the resources to correct those deficiencies, I don't think we would be here today. (Tr. 358.)

We considered the following testimony of Dr. Camp of particular significance in regard to our conclusion that we should delay final determination of this case until it became certain that the State of Missouri, at long last, was finally going to construct and maintain a medium security correctional institution in the Greater Kansas City metropolitan area:

We have planned, we have thought, we have talked, but we have not acted. . . Perhaps what we need are overnight lockups in each of the counties to assist the court in the initial arraignment of the defendant and then we need a series of State-operated jails, such as the State of Connecticut has, where each county would transport its pretrial detainees as well as those individuals serving misdemeanor sentences, and that the State operate these and either funded completely by the State or where each county pays its share in terms of the number of individuals that it boards there, some sort of workable arrangement. . . . I think [the problem] is much broader than just the Platte County Jail. It is something that needs to be addressed within the entire State. [Tr. 359–60]

This Court, for the reasons stated, has long been familiar with repeated proposals and recommendations for the establishment of regional detention facilities for the various counties located in this part of the State of Missouri. Consultants for the Northwest Missouri Law Enforcement Assistance Council, for example, recommended to that body in 1971 that a major regional detention facility be established in Jackson County and that new satellite jails for Clay and Platte Counties be constructed only for the purpose of housing pretrial inmates for periods of seven days or less. Those consultants estimated that the costs of the recommended satellite jail facilities would be $476,300 for Clay County and $492,000 for Platte County. See *Feasibility Study for Northwest Missouri Regional Center*, prepared as a joint venture by SUA, a division of Dillingham Corporation, and Prindle and Patrick, Architects and Planners (1971). The recommendations of that feasibility study, and others like it, were based on the obvious ground that the taxpayers of Platte and Clay Counties should not be called upon to bear the burden of building duplicate full scale jail facilities when the construction of a single facility for use of several counties would more adequately serve the needs of all governmental units involved.

Most informed persons have long recognized that if the always complicated problems of establishing cooperative inter-governmental arrangements could be solved in regard to the location and financing of the long-needed new correctional facilities in Jackson, Clay and Platte Counties, the implementation of some viable working arrangement with the State of Missouri could result in a substantial saving of public money under the circumstances. Both State and local interests would obviously have been served by such a working arrangement.

The evidence adduced in this case established that the primary use of the Platte County Jail in recent years has been for housing pretrial detainees who are accused but not convicted of any crime. In recent years, a relatively small number of convicted defendants have actually served sentences in the Platte County Jail. The evidence also established that the same thing is true of Clay County, Missouri. Indeed, the evidence shows that the officials of Clay County, faced with the reality of no available State aid for county jails, entered into a formal cooperative contract with the City of Kansas City, Missouri, under which persons convicted of State criminal law violations in the Circuit Court of Clay County actually serve their sentences in the Municipal Correctional Institution maintained by the City of Kansas City, Missouri.

The vast majority of all persons confined in county jails throughout the State of Missouri are being held for alleged or proven violations of the criminal laws of the State of Missouri. Historically, however, the State of Missouri has thus far refused to assume any direct responsibility for the cost of maintaining custody of persons convicted of violations of its own criminal laws, unless such persons receive a sentence of two or more years. See § 546.490, V.A.M.S., which provides in part that "no person shall in any case be sentenced to imprisonment in the penitentiary for any term less than two years."

Thus, all costs for holding persons accused of violations of the criminal laws of the State of Missouri in the county jails of Missouri, and all costs for holding persons serving sentences of one year or less in county jails for violations of State law, see § 546.500, have historically been and at the present time are being imposed directly on the county in which the defendant is held for trial or in which he was convicted.

In spite of the obvious fact that Missouri's antiquated system of incarcerating persons charged and convicted of violations of its own State criminal laws in county jails scattered throughout the State is breaking down, the State of Missouri continues to ignore the problems created by its consistent legislative neglect. Amicus Curiae's Exhibit 12, a survey of Missouri's jails made by the Corrections Task Force of the Missouri Association for Social Welfare in 1974, accurately reported that since the National Jail Census was taken by the Law Enforcement Assistance Administration in 1970, nine county jails in Missouri's 144 counties have been abandoned as unfit for human habitation and one has been completely destroyed. Forty-five of the remaining 134 county jails in Missouri are seventy-five to one hundred years old, or older. [Id. at 5]. Speaking generally, that report accurately stated that "[m]ost of the people who are annually processed in Missouri jails have not been found guilty of [any] crime . . . [but] these legally innocent prisoners must live in dangerous situations, and inhumane treatment of prisoners, either legally innocent or guilty, is a direct violation of Amendment VIII of the United States Constitution." [Id. at 7].

The 1974 Missouri Association for Social Welfare (MASW) Corrections Task Force Report directed attention to the fact that "[c]ontrary to the common assumption, the overwhelming number of people in Missouri's jails at any one time are first offenders, . . . are not major offenders, but are instead people awaiting trial on misdemeanant charges or serving a sentence for a minor crime, . . . and *are not* major risks to the community." [Id. at 8; emphasis the Report's]. That Report, however, in recognition of the apparent facts of political life as it has long been practiced in the State of Missouri with regard to correctional institutions, stated that "[p]olitically, Missouri jails are unloved, but jealously guarded stepchildren, . . . millions of dollars in revenuesharing money have been lost because two jurisdictions within a few miles insist on developing their own jails [with] the end result [of] two new jails filled only rarely during the year, with neither having rehabilitative programming." [Id. at 18].

It is apparent that the location of a medium security correctional institution in Clay County would have reflected a long-deferred recognition by the State of Missouri that something had to be done in regard to its long-neglected duty to provide appropriate correctional institutions for those convicted of violations of State law. Such action would have also afforded the State of Missouri an appropriate opportunity to experiment with the establishment of workable arrangements with nearby county governmental units, including but not limited to Platte County, under which persons convicted of violations of State laws could serve their sentences in the new medium security institution.

The establishment of such a working arrangement between the State correctional system and local county governmental units would obviously have eliminated any necessity for the participating counties to construct and maintain more than a pretrial detention facility solely for housing of persons accused of State law violations, rather than a facility in which convicted defendants would serve their sentences.

Persons convicted in the Circuit Court of Platte County of violations of State criminal laws, for example, would have been able to serve their sentences in the State medium security correctional institution under the anticipated working arrangement. Such persons would have had the benefit of the appropriate rehabilitative programs as would have been established in the State medium security correctional institution for

the larger number of inmates who would have been confined in that institution.

The difference in the cost of construction, maintenance, and operation of a county pretrial detention holding facility and a full-scale county jail, in which a handful of convicted defendants would serve sentences of a year or less, is quite obvious. The possibility that the State of Missouri and Platte County would have been able to agree upon a workable arrangement to serve the needs of both governmental units required that appropriate consideration be given to the obvious saving of public funds and to a more equitable distribution of the cost of housing for persons serving sentences for convictions of State law, rather than local law.

The recent revival by the Executive Branch of the State of Missouri's plans to locate a medium security correctional institution in Clay County was viewed in further light of the fact that Platte County, Missouri had passed its bond issue for the construction of a new jail in November, 1976. Familiarity with the provisions of Art. 6, § 16 of the Constitution of Missouri, which grants power to all political subdivisions of the State of Missouri to contract and cooperate with each other, with other States, and with the United States for planning, construction, and operation of any public facility, when considered in light of Platte County's passage of its jail bond proposal, in light of the continued interest in Clay County to solve its increasingly difficult jail problem, and in light of the anticipated location of a new State medium security correctional institution in Clay County, suggested that this Court continue to withhold final determination in this case until after the State of Missouri had completed its site acquisition and committed funds for the construction of its new facility so that all three separate units of government would be able to give appropriate consideration to whether workable arrangements could be agreed upon under which a combination of their resources would, without duplication, meet their separate needs.

Any further delay in the final determination of this case can no longer be justified on the theory that the State of Missouri may meet its responsibilities within a reasonable period of time. The recent turn of events in the Legislative Branch of the State of Missouri in regard to the establishment of a medium security correctional facility at the site selected by the Executive Branch of the State of Missouri in southern Clay County may, once again, effectively foreclose and indefinitely postpone any affirmative action by the State of Missouri in regard to the discharge of its long-recognized duties and responsibilities to establish and maintain appropriate correctional institutions in this State.

While this Court was most hopeful for the success of the revived effort of the State of Missouri to recognize and to deal realistically with its increasingly difficult problems of providing adequate State and local correctional institutions, we have reluctantly concluded in light of the circumstances stated that any further delay in the final determination of this case cannot be justified under the circumstances.

## II.

There has never been any substantial dispute about most of the relevant and material factual circumstances of this case. The parties stipulated and agreed in Standard Pretrial Order No. 2 that the following facts were true and required no proof:

1. Plaintiff Fred Ahrens was confined in the Platte County Jail from August 11, 1973 to September 30, 1974. He was a pretrial detainee upon a charge of Burglary II and Stealing, and is an adult citizen of the United States and the State of Missouri.

2. Thomas J. Thomas is the duly elected Sheriff of Platte County, Missouri, and among his duties are those specified in R.S.Mo. § 221.020.

3. Henry Miller, Alfred Kyle and Charles Kutz are duly elected judges of the Platte County Court and are responsible for performing duties prescribed by R.S.Mo. §§ 49.310 and 221.120.

4. A Platte County Jail was erected in 1867 on the present site, according to *Annals of Platte County Missouri, From Its Explorations Down to June 1, 1897,* by William M. Paxton, Hudson, Kimberly (Kansas City, Missouri 1897). The jail was restored in 1887.

5. During part of the winter months of November and December, 1972, and January, 1973, there were 32 windows broken out on the south side of the jail.

6. Blankets are washed only on an irregular basis.

7. No sheets are provided for the beds.

8. There is uninsulated electrical wiring hanging down into the inmate area in the "South" tank.

9. No shampoo, toothpaste, toothbrushes, combs or razors are furnished.

10. Towels and washcloths are generally not provided to inmates. These items are only provided to those inmates that jail personnel determine are indigent, and that definition limits indigency to inmates who have no money to use to purchase cigarettes, candy, soft drinks, or other commissary items.

11. No area is provided for exercise or recreation and no games or entertainment are provided.

12. There are no programs or facilities for counseling, training, rehabilitation, or education.

13. There are no facilities or medical personnel at the jail, and no medical screening procedure is used when new inmates are incarcerated.

14. A prisoner notifies the jailer when he desires to see a doctor; and the jailer, a person with no medical training, decides what action is appropriate for any particular case.

15. Prisoners at the Platte County Jail are generally confined to their tank areas at all times except for trips to the courthouse, visits to a doctor's office, and interviews with attorneys.

16. There is no regular program for having a doctor visit the jail to attend to the medical needs of the prisoners.

17. No regular program for taking any prisoner complaining of a physical ailment to see a doctor promptly has been established.

18. New inmates are given the opportunity to sign a waiver to allow jail officials to open their mail.

19. Prisoners who refuse to sign this waiver are not permitted to receive any correspondence, except for that received from attorneys, ministers, and the courts.

20. It has been the practice at the Platte County Jail to open and read all incoming mail that is not privileged.

21. Normal visiting hours are 10:00 a.m. to 4:00 p.m. on Sunday; attorneys and members of the clergy are allowed to visit at other reasonable times.

22. People are not allowed to visit inmates unless their names appear on an approved list of visitors.

23. The sheriff has withheld commissary privileges from an entire tank in situations where he has been unable to determine who among the group acted in a manner to cause the sheriff to take such action.

24. Those hired as guards at the Platte County Jail receive no specific training to prepare them for their duties as guards in a detention facility.

25. No formal classification of prisoners is made, and pretrial detainees for all offenses as well as those sentenced to serve time at the Platte County Jail are at times housed together in the two cell tank areas.

Eighth Amendment cases are among the most difficult of all constitutional cases to determine. For, unlike many of the guarantees of the Bill of Rights, the Eighth Amendment's prohibition against cruel and unusual punishment is stated in relative rather than precise language. To make the problem of adjudication more difficult, the basic concept of the Eighth Amendment, which may be traced back to the Magna Carta, is "nothing less than the dignity of man" and involves "evolving standards of decency that mark the progress of a matur-

ing society." *Trop v. Dulles,* 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

The ascertainment of what must be considered constitutionally contrary to contemporary concepts of "the dignity of man" and accepted "standards of decency" within the meaning of the Eighth Amendment is, at least in some measure, aided by the particular data received in evidence and testimony in regard to the conditions of confinement in the Platte County Jail as viewed by disinterested but informed experts having no direct interest in the outcome of this pending case. Certainly judges should give appropriate consideration in Eighth Amendment cases to such data and the testimony of such witnesses from the general community, else their decisions may reflect merely their own predispositions in regard to contemporary concepts of "the dignity of man" and "evolving standards of decency."

Judges do not need to review historical data nor listen to expert testimony in order to determine whether a defendant is being held to answer an indictment filed in the State and district wherein the crime shall have been committed, as required by the Fifth and Sixth Amendments of the Constitution. The constitutional standards of those Amendments are precise and the factual circumstances are easily determined.

The relative language of the Eighth Amendment, however, presents an entirely different juridical problem. Judge, now Mr. Justice Blackmun reviewed the controlling Supreme Court and Eighth Circuit Eighth Amendment cases in the leading case of *Jackson v. Bishop,* 404 F.2d 571, 576–579 (8th Cir. 1968). He noted at the outset of his discussion of those cases that the Supreme Court has repeatedly acknowledged the difficulty first noted almost a century ago in *Wilkerson v. Utah,* 99 U.S. 130, 135–136, 25 L.Ed. 345 (1878), that "would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishment shall not be inflicted . . . ." [*Id.* at 577].

Mr. Justice Blackmun, in his summary of the Eighth Amendment cases in *Jackson v. Bishop,* stated that "so far as the Supreme Court cases are concerned, we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible . . . and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." [*Id.* at 579]. *Holt v. Sarver* (8th Cir. 1971) 442 F.2d 304, 308, quoted the following with approval from *Sostre v. McGinnis* (2nd Cir. 1971) 442 F.2d 178, 191:

As judges we are obliged to school ourselves in such objective sources as historical usage, see *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1870), practices in other jurisdictions, see *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and public opinion, see *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), before we may responsibly exercise the power of judicial review to declare a punishment unconstitutional under the Eighth Amendment. [442 F.2d at 191].

We therefore state in some detail that which, in Mr. Justice Blackmun's language in *Jackson v. Bishop,* we have found to be "useful and usable" in our determination of this Eighth Amendment case. While we shall make further and formal findings of fact in part V of this memorandum opinion, we believe, in light of the relative standard of the Eighth Amendment, that it is appropriate to make reference to particular testimony of the expert witnesses who testified at trial in regard to the conditions under which the plaintiffs are confined, most of them while awaiting trial. Those expert witnesses, many of admittedly national reputation, added considerable detail to the stipulated facts. All of those witnesses testified in light of their personal inspection and evaluation of the Platte County Jail. The Court, pursuant to the agreement of counsel and in their presence, personally examined the Platte County Jail on two separate occasions.

Melvin T. Axilbund, staff director of the American Bar Association's Commission on Correctional Facilities and Services since 1971 and principal author of the National Sheriffs Association publication "Inmates Legal Rights," testified that the Platte County Jail failed to meet many of the standards officially adopted by various state legislatures, state departments of corrections, or standards officially promulgated by other appropriate state agencies which, unlike Missouri, have adopted legal standards for their respective states.

Theodore James Gordon, acting chief of the Institutional Hygiene Division of the Environmental Health Administration of the District of Columbia, testified that the Platte County Jail "is totally, in my judgment, unfit for human inhabitation from a standard housing viewpoint as well as an environmental health and safety standpoint." [Tr. 155]. He testified that if the Platte County Jail was in his jurisdiction, "I would recommend that the facility be closed down, the people taken out and an immediate effort and steps be taken to clean that institution up and comply with basic requirements, Public Health standards." [Tr. 166].

James Victor Gagne, Jr., Superintendent of Corrections for the City of Kansas City, Missouri, and head of that city's new Municipal Correctional Institution, testified that "at all times that I inspected the Platte County Jail it was generally dirty, there was trash scattered about the area, the mattresses, the pillows, everything concerning the jail was generally one of squalor." [Tr. 170]. He further testified that "if no standards are adopted or changes made, I do not believe the jail should be allowed to operate." [Tr. 217].

Donald C. Maase of the University of Illinois and the National Clearing House for Criminal Justice, Planning and Architecture, and author of that national organization's guidelines for the planning and design of regional and community correctional centers for adults, testified that the existing Platte County Jail could not be refurbished in a manner that would comply with minimum National Clearing House Standards. [Tr. 230]. He was of the opinion, however, that it could be remodeled in a manner which would permit its possible use "as a short term holding facility during some period while a trial was in process." [Tr. 231–232].

Dr. Edward J. Twin, Executive Director of Kansas City General Hospital Medical Center, Professor of Medicine at the University of Missouri at Kansas City School of Medicine, and professionally responsible for the establishment of a nationally known medical service unit in the Jackson County Jail, established pursuant to Part IV of the consent judgment and decree entered by this Court in *Goldsby v. Carnes* (W.D.Mo. 1973) 365 F.Supp. at 406, testified that the Platte County Jail should be "closed until appropriate health care is provided." [Tr. 263].

James D. H. Reefer, Director of the Community Services Department of Kansas City, Missouri, with over thirty-five years experience in the field of corrections, both federal, State, and local, since receiving his Master's degree in Sociology and Criminology from the University of Michigan, testified that "something has to be done immediately for the proper care and protection of the prisoners" and that "if there are no improvements made in the Platte County Jail . . . prisoners should [not] be continued to be confined in that facility." [Tr. 207].

Dr. Norge Winifred Jerome, Associate Professor of Nutrition at the University of Kansas Medical Center, who made a careful and detailed evaluation of the food served inmates of the Platte County Jail over a period of a representative month, testified that "the diet was inadequate by about one-third the national standard . . . extremely inadequate nutritionally" [Tr. 314], and that "if there was no way that the diet could be changed" she had no reservations about recommending "against continuing to have persons housed in a place where they are fed only this diet . . . because you would, of course, be placing the individual at risk, risk of his health." [Tr. 315].

James Bergfalk, Director of Corrections of Jackson County, Missouri, who was directly responsible for the administration of the Jackson County Jail at the time of trial, testified that "unless there are significant facility changes, and unless there are significant operations changes [in the Platte County Jail] as it relates to classification, as it relates to sanitation, health, things of that nature [no inmates should] continue to be confined in that facility." [Tr. 331]. Mr. Bergfalk further testified that if significant changes were made, he believed that the present Platte County Jail "could be utilized for short-term holding; very short-term holding." [Tr. 332–333]. Mr. Bergfalk defined a "short-term holding" as a period of time necessary "for intake, basic processing prior to arraignment . . . it could possibly be used for holding through a trial period, if it is a short trial . . . I think anything in excess of seven days is improper." [Tr. 332].

Dr. George Mallory Camp, who as stated in Part I, *supra,* was directly responsible for the direction of the Missouri Division of Corrections at the time of trial, testified that "if the Platte County Jail is continued to operate in the manner that it is and there are no physical improvements or changes . . . pretrial detainees . . . should [not] be confined in the Platte County Jail." [Tr. 360–361]. Dr. Camp testified that until and unless substantial changes were made in the present Platte County Jail, the facility should not be permitted to operate for any purpose. [Tr. 389]. Dr. Camp further testified that if he had power under State law to do so, he would close the Platte County Jail because of its "failure to meet constitutional standards." [Tr. 383].

Dr. Herbert C. Modlin, a member of the Staff of the Menninger Foundation in Topeka, Kansas, was at the time of trial Chairman of the Advisory Committee of the American Medical Association project to investigate medical services in prisons and jails throughout the United States. That project was established at the request of and with the approval of the American Bar Association's Commission on Correctional Facilities and Services. Dr. Modlin, who has been consultant for the Medical Center for Federal Prisoners at Springfield, Missouri and the Federal Penitentiary at Leavenworth, Kansas for the past ten years, testified that "the place ought to be torn down, and I think I make that as a measured opinion, not some kind of emotional outcry . . . [i]t is just—well, it is a hundred years out of date." [Tr. 420].

It is quite clear that all of the expert testimony reflected unanimous agreement that the Platte County Jail should be closed for all purposes until and unless substantial changes are made in the physical structure of that facility and in the manner it is presently being operated. The specific attention of each expert witness was focused on a different physical and operational aspect of the jail. Mr. Axilbund, for example, as staff director of the American Bar Association's Commission on Correctional Facilities and Services, utilized data gathered from other states by that project's study of jail standards and inspection systems on a national basis for his testimony. Dr. Modlin's perspective was that of the American Medical Association's similar nationwide inquiry into medical and health services. Mr. Maase of the National Clearing House for Criminal Justice concentrated on the architectural deficiencies of the century-old building in which the Platte County Jail facility is located. Witnesses Camp, Gordon, Twin, Reefer, Jerome and Bergfalk all testified from their daily experience as professionals in various areas of the State and local corrections field. In general, the testimony of all of the experts reflected their familiarity with and application of various standards promulgated by other states and by various professional groups and organizations, such as the National Advisory Commission on Criminal Justice Standards and Goals, the National Sheriffs Association, and the National Correctional Association.

The current special issue of *The American Criminal Law Review,* Vol. 14, No. 3 (Winter 1977), contains the "Tentative Draft of Standards Relating to the Legal Status of Prisoners," proposed by the Criminal Justice Section of the American Bar

Association for adoption as one of the American Bar Association's approved "Standards Relating to the Administration of Criminal Justice." Just as tentative drafts of other Standards Relating to the Administration of Criminal Justice have been cited in judicial opinions in the past, we believe that the "Tentative Draft of Standards Relating to the Legal Status of Prisoners" will be cited in the future.

██ The citation of a tentative draft or of a finally approved American Bar Association Standard Relating to the Administration of Criminal Justice, or the citation and approval of standards promulgated by other professional groups or organizations, of course, does not mean that the principles of law stated are the law of the land until and unless those principles are fully and directly accepted by a court deciding a particular case. But this is not to say that the various standards to which the expert witnesses made reference in their testimony are irrelevant and immaterial and therefore not entitled to appropriate consideration in the determination of this case. Clearly, however, proof of violation of one or more of those standards is not controlling or conclusive evidence that the manner in which the Platte County Jail is constructed, maintained and operated is necessarily a violation of the constitutional standard mandated by the Constitution of the United States. This Court fully recognizes that there are particular degrees "to which the prison officials may [depart] from desirable procedures or state standards [which] cannot be magnified into a fundamental constitutional error mandating a decree from this tribunal." *Burns v. Swenson,* 430 F.2d 771, 776 (8th Cir. 1970).

██ Nevertheless, in our judgment, evidence of failure to meet a standard promulgated by the National Sheriffs Association, for example, is relevant and material to the constitutional questions presented in this case and similar cases, although such evidence, standing alone, may not be determinative or conclusive in establishing a constitutional violation. Because experience in similar cases involving conditions of confinement in other correctional institutions reflects the existence of some degree of confusion in regard to the appropriate judicial treatment of standards promulgated by various professional groups and organizations, we deem it appropriate to discuss in greater detail the manner in which we have considered such standards in this case.

### III.

Plaintiffs and amicus curiae have suggested that we make a substantial number of formal findings of fact in regard to various standards promulgated by national organizations such as the National Advisory Commission on Criminal Justice, Planning and Architecture; the American Medical Association; the American Bar Association Commission on Correctional Facilities and Services; the National Clearing House for Criminal Justice Planning and Architecture; and the National Sheriffs Association.

Although it is clear under the virtually undisputed factual circumstances that the Platte County Jail and its present manner of operation do not in fact comply with those standards, defendants argue that the Supreme Court of the United States has not yet articulated any constitutional standards for jails and that therefore, plaintiffs and amicus curiae "have failed to prove that any minimum constitutional standards exist for county jails, and if such exist what they are." [No. 15 of Defendants' Proposed Conclusions of Law]. Defendants further argue that while there has been a showing that many different types of jail standards exist, actual compliance with such standards varies from state to state and within a particular state. Defendants maintain that there has been no showing that a majority of the states have adopted any particular standards or that the State of Missouri has adopted any of the standards proposed by the various national groups and organizations named above. Defendants, therefore, argue that standards promulgated by other states or by various professional groups and organizations may not be considered as relevant and material to any of

the constitutional questions presented in this case.

We have already indicated that we quite agree with the defendants' suggestion that proof that the Platte County Jail, as it is presently constructed and operated, does not comply with a particular standard does not, standing alone, establish a violation of the Constitution of the United States. We do not agree, however, as we have also stated, that evidence of a failure to meet standards promulgated by recognized state and national bodies is not relevant and material in a case such as this.

Chief Justice Warren's plurality opinion announcing the judgment of the Court in *Trop v. Dulles*, 356 U.S. 86, 99, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), took note of the relatively small number of Supreme Court cases construing "the principle of civilized treatment guaranteed by the Eighth Amendment." He also noted that "[t]he exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court." [*Id.* at 99, 78 S.Ct. at 597]. He suggested, however, that "the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice." [*Id.* at 99–100, 78 S.Ct. at 597].

Chief Justice Warren added that:

The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society. . . . [*Id.* at 100–101, 78 S.Ct. at 597–598].

It is of more than historical interest to note that the Declaration of Principles of the American Correctional Association, which revised and reaffirmed principles initially stated by the American Prison Association in 1870, also spoke of "human dignity" and "standards of decency." Principle XVI was stated in the following language:

The principles of humanity and human dignity to which we subscribe, as well as the purposes of rehabilitation require that the offenders, while under the jurisdiction of the law enforcement and correctional agencies, be accorded the generally accepted standards of decent living and decent human relations.

Their food, clothing and shelter should not be allowed to fall below the generally accepted standards, and they should be afforded the conventional conveniences made possible by our technological progress. Their health needs—both physical and mental—should be met in accordance with the best medical standards. Recreation should be recognized as a wholesome element of normal life. [*Manual of Correctional Standards*, Pl. Ex. 9, p. xxi].

We recognize, of course, that the primary responsibility for maintaining concepts of dignity and standards of decency in regard to persons charged and convicted of State law violations rests upon the Executive and Legislative branches of our State governments, subject, however, to the mandate of the Constitution of the United States. Long and consistent default on the part of those branches of State government has forced both State and federal courts to abandon their former "hands off" doctrine and to determine whether correctional institutions in general, and jails in particular, were being maintained and operated in accordance with constitutional standards. The correctional institution involved in this case is a county jail originally constructed over a hundred years ago to meet the needs of a then rural county.

Of all institutions borrowed from England, the jail has successfully resisted change more than almost any other institution. Gustave de Beaumont and Alexis de Tocqueville, who came to the United States in the early nineteenth century to examine America's experiment with penitentiaries, were shocked to find that jails in their old familiar form existed side by side with what was then a new and radical experiment in the treatment of persons convicted

of crime. In their work entitled *On the Penitentiary System of the United States and Its Application In France*, H. R. Lantz, ed., So. Ill. Univ. Press, 1964, p. 49, they noted that in the American transplant of jails from England, "nothing has been changed; disorder, confusion, mixture of different ages and moral characters, all the vices of the old system still exist."

The National Advisory Commission on Criminal Justice Standards and Goals, appointed in 1971 by the Law Enforcement Assistance Administration (LEAA) to formulate national criminal justice standards and goals for crime reduction and prevention, opened the chapter on jails (in its 1973 *Report on Corrections* by stating the following:

> Remote from public view and concern, the jail has evolved more by default than by plan. Perpetuated without major change from the days of Alfred the Great, it has been a disgrace to every generation. [*Id.* at 273].

When that Commission stated on page 275 that "[t]he most striking inadequacy of jails is their abominable physical condition," it did no more than reiterate the findings of the 1967 Task Force Report on Corrections of The President's Commission on Law Enforcement and Administration of Justice. [Pl. Ex. 10]. That Report reviewed the 1965 National Survey of Corrections of 3,500 jails in the United States and concluded that "[n]ot only are the great majority of these facilities old, but many do not even meet the minimum standards in sanitation, living space, and segregation of different ages and types of offenders that have obtained generally in the rest of corrections for several decades." [*Id.* at 75].

The Presidential Commission recognized that "[m]ost rural counties cannot afford the personnel, facilities, and services a good short-term institution should have" and recommended that "[s]mall jurisdictions should arrange to contract with nearby metropolitan areas for all the needs they cannot meet effectively themselves." [*Id.* at 80].

In 1970, acting in response to a special call from the Chief Justice of the United States, the American Bar Association established the Commission on Correctional Facilities and Services. In November, 1975 that Commission published a five year report for the years 1970–1975 entitled *When Society Pronounces Judgment.* [Am.Cur. Ex.37]. In commenting on the Commission's statewide jail standards and inspection systems project, it concluded that "[t]he nation's jails remained a blight on the correctional scene, offering perhaps the most degrading and inefficient environment for handling offenders in the whole spectrum of correctional institutions and services." [*Id.* at 69].

Various reports and surveys of Missouri jails establish that Missouri has ignored its jails as has the rest of the country. *The Jails of Missouri* the 1967 Report of the Governor's Citizens Committee on Delinquency and Crime, concluded on its examination and evaluation of various typical jails throughout the State of Missouri that:

> The individual reports of the jails evaluated in the Citizens Committee survey, unfortunately, but not surprisingly, reflect that Missouri's jails fail to meet minimum standards of physical adequacy, segregation of inmates, administrative procedures, personnel, inmate employment or activities. The latter, basic to any rehabilitative effort, is virtually absent in our jails. Inmates sit in idleness, despair, isolation from the community, daily becoming more hostile, apathetic, dependent and less capable of meeting the responsibilities of normal citizenship. [*Id.* at 3] [Am.Cur.Ex.8].

The Committee's statement of the problem of jails in Missouri is consistent with the statements of the national problem by the national commissions to which we have made reference. The Committee summarized by stating the following:

> The history of jails is a gruesome chronicle of a social-legal misadventure in handling society's villains, failures, friendless, poor, rebels, and other arrested citizens. It is not misleading to state that jails in this country, including Missouri, seem to have been built and operated in a manner purposely designed to be:

—damaging when they should be constructive;

—disorganized when they should be orderly;

—filthy when they should be clean;

—debilitating when they should be rehabilitating;

—depressing when they should be enlightening;

—dangerous when they should be safe. [*Id.* at 1].

The 1976 *Missouri Action Plan For Public Safety: Criminal Justice Goals, Standards and Action Plans for the State of Missouri,* a report made by the Missouri Department of Public Safety at the request of Governor Bond, accepted the conclusions of the 1967 report to an earlier Governor of Missouri and noted that "surprisingly little has been done to upgrade correctional services." [*Id.* at 4] [Am.Cur.Ex.17]. The report also took note of the consequences of continuing Executive and Legislative neglect of the State of Missouri's jail problem when it accurately reported that:

The civil and constitutional rights of pretrial detainees have been the subject of substantially increased litigation in the federal courts in recent years. Correctional authorities are oftentimes required to make costly and immediate modifications to detention facilities ranging from physical facility alterations to revised programming. [*Id.* at 4].

We believe that the historical factual data concerning jails, as contained in the exhibits in evidence, and the testimony of the expert witnesses in regard to standards must be given appropriate consideration in our judicial determination of whether the Platte County Jail, as constructed, maintained, and operated, is in compliance with minimum constitutional standards. We shall therefore discuss the degree to which the Platte County Jail can be said to be in compliance with the standards approved by various national groups and organizations.

## IV.

The National Advisory Commission on Criminal Justice Planning and Architecture

has promulgated ten minimum standards for detention facilities, entitled "Basic Architectural Planning Criteria." [Pl.Ex.32]. The Platte County Jail does not comply with nine of the Clearinghouse's ten criteria; the only criterion it complies with mandates a maximum residential capacity of less than 400 inmates.

The American Medical Association has established a project for the purpose of adopting minimal health care standards for jails. That project is approved by the American Bar Association Commission on Correctional Facilities and Services, which requested the assistance of the American Medical Association after finding that many jails visited by the American Bar Association Commission lacked or had deplorable medical services. Plaintiffs' Exhibit No. 38 is a summary of Plaintiffs' Exhibit No. 13, and both of those exhibits reflect the minimum standards which the American Medical Association project will include in its final report. Plaintiffs' Exhibit No. 38 states seven minimal standards that have received the consensus approval of the American Medical Association Advisory Committee. None of those standards are presently met by the Platte County Jail.

The Platte County Jail also fails to meet the three basic "self-evident" standards set out on pages 3 and 4 of Plaintiffs' Exhibit 2, "Inmates' Legal Rights," the handbook of the National Sheriffs Association. As the Jail is currently maintained and operated, the inmates of the Jail are not accorded the following rights, as defined in the handbook:

The first right, concerning personal safety and welfare, as set out on page 9 and explained on pages 9–10; the second right, concerning cruel and unusual punishment, as set out on page 11 and explained on pages 11–12; the third right, concerning a healthful environment, as set out on page 13 and explained on pages 13–16; the sixth right, concerning the presumption of innocence for prisoners awaiting trial, as set out on page 19 and explained on pages 19–20; the eighth right, concerning discipline consistent with due process, as set out on page

22 and explained on pages 22–23; the ninth right, concerning the procedure for imposing punishment, as set out on page 24 and explained on pages 24–26; the tenth right, concerning discipline of prisoners by prisoners, as set out and explained on page 27; the twelfth right, concerning consultation with attorneys, as set out and explained on page 30; the fourteenth right, concerning prisoners' rights to prepare legal papers, as set out on page 33 and explained on pages 33–34; the sixteenth right, concerning grievance procedure as set out on page 37; the nineteenth right, concerning visitation and mail, as set out on page 42 and explained on pages 42–43; and the twentieth right, concerning participation in programs, as set out on page 44 and explained on pages 44–45.

The Platte County Jail, as it is presently operated, does not comply with the following standards promulgated by the National Advisory Commission on Criminal Justice Standards and Goals and published in its volume, *Corrections* [Pl.Ex.1]: Standard 2.1, "Access to Courts," pages 23–25; Standard 2.2, "Access to Legal Services," pages 26–28; Standard 2.4, "Protection Against Personal Abuse," pages 31–33; Standard 2.5, "Healthful Surroundings," pages 34–35; Standard 2.6, "Medical Care," pages 36–37; Standard 2.7, "Searches," pages 38–40; Standard 2.8, "Nondiscriminatory Treatment," pages 41–42; Standard 2.9, "Rehabilitation," pages 43–45; Standard 2.11, "Rules of Conduct," pages 49–50; Standard 2.12, "Disciplinary Procedures," pages 51–53; Standard 2.13, "Procedures for Nondisciplinary Changes of Status," pages 54–55; Standard 2.14, "Grievance Procedure," pages 56–57; Standard 2.15, "Free Expression and Association," pages 58–62; Standard 2.16, "Exercise of Religious Beliefs and Practices," pages 63–65; Standard 2.17, "Access to the Public," pages 66–69; Standard 2.18, "Remedies for Violation of an Offender's Rights," pages 70–72; Standard 4.8, "Rights of Pretrial Detainees," pages 133–135; Standard 4.9, "Programs for Pretrial Detainees," pages 136–137; Standard 9.4, "Adult Intake Services," pages 296–297; Standard 9.5, "Pretrial Detention Admission Process," pages 298–299; Standard 9.6, "Staffing Patterns," pages 300–301; Standard 9.7, "Internal Policies," pages 302–303; Standard 9.8, "Local Correctional Facility Programming," pages 304–305; and Standard 9.9, "Jail Release Programs," pages 306–307.

Although it is clear that the Platte County Jail does not comply with many of the standards contained in the recently published "Tentative Draft of Standards Relating to the Legal Status of Prisoners," recommended by the Criminal Justice Section of the American Bar Association, we do not discuss those standards in any detail because that tentative draft was not published at the time of trial and was therefore not a part of the evidence before the Court in this case.

Our formal findings of fact are made in the next part of this opinion.

## V.

### FINDINGS OF FACT

1. Fred Ahrens was a pretrial detainee at the Platte County Jail from August 11, 1973 to September 30, 1974, upon a charge of burglary II and stealing. He is an adult citizen of the United States. (Stipulation 1)

2. The defendants in this case are the duly elected sheriff and judges of the County Court of Platte County, Missouri. (Stipulations 2, 3)

3. In connection with their testimony during the trial of this case, witnesses for plaintiffs and amicus curiae visited the Platte County Jail. (Axilbund, Tr. 88, 91; Gordon, Tr. 116; Gagne, Tr. 169–170; Maase, Tr. 225; Twin, Tr. 252; Reefer, Tr. 292, and Amicus Curiae's Ex. 38, p. 1; Bergfalk, Tr. 320; Camp, Tr. 350; Modlin, Tr. 405)

4. The budget of the Platte County Jail is insufficient to meet the basic needs of those persons incarcerated in the Platte County Jail. (Camp, Tr. 355–356; Allen, Tr. 435)

5. The State of Missouri does not assume any responsibility regarding the oper-

ation or conditions found in jails within the State, including the Platte County Jail. (Camp, Tr. 387)

6. Minimum jail standards legislation has been introduced but not passed in the Missouri legislature during each of the past several sessions. (Amicus Curiae's Ex. 14–16; Camp, Tr. 358, 362)

7. Persons confined at the Missouri State Penitentiary are convicted of felonies and sentenced to confinement for a period of at least two years. (Camp, Tr. 351)

8. Inmates at the Missouri State Penitentiary have outside recreation available; detainees at the Platte County Jail do not. (Camp, Tr. 352; the Court, Tr. 202, 203)

9. Inmates at the Missouri State Penitentiary have greater ability to move around within the institution than detainees of the Platte County Jail have. (Camp, Tr. 353)

10. Inmates at the Missouri State Penitentiary have much greater access to telephones than the detainees at the Platte County Jail have. (Camp, Tr. 353)

11. Inmates at the Missouri State Penitentiary have more frequent visitation than the detainees at the Platte County Jail have. (Camp, Tr. 354)

12. Convicted inmates at the Missouri State Penitentiary have far greater freedoms and liberties than pretrial detainees, who are presumed to be innocent, incarcerated at the Platte County Jail. (Camp, Tr. 351–352)

13. The degree of security in terms of internal movement by individuals within the maximum security institution for the State of Missouri, the Missouri State Penitentiary, is much less than the degree of security experienced by inmates in the Platte County Jail. (Camp, Tr. 352)

*Physical Conditions*

14. The Platte County Jail, built over 100 years ago, consists of two tanks containing three 4-person cells and three 2-person cells not located in any tank. (Ahrens, Tr. 7, 8; Thomas, Tr. 469; Plaintiffs' Ex. 23; Stipulation 4)

15. The tanks are referred to as the "North Tank" and the "South Tank." (Ahrens, Tr. 7, 8; Thomas, Tr. 483; Plaintiffs' Ex. 23)

16. The tanks are surrounded on two sides by runways to which inmates have no access. (Ahrens, Tr. 7, 8; Plaintiffs' Ex. 23)

17. All windows and radiators in the area containing the tanks are located on the outer perimeter of the runways. (Ahrens, Tr. 7, 8; Plaintiffs' Ex. 23)

18. The South Tank contains a shower, sink, and toilet with the shower located directly above the toilet. (Ahrens, Tr. 7; Plaintiffs' Ex. 23)

19. The North Tank contains a sink and toilet, but no shower. (Ahrens, Tr. 7; Plaintiffs' Ex. 23)

20. The plumbing facilities are inadequate in that they are deteriorated and obviously old. (Maase, Tr. 228)

21. A very high percentage of those persons housed in the Platte County Jail are pretrial detainees. (Thomas, Tr. 501; Defendants' Ex. 1, 2)

22. The average stay of an inmate being held at the Platte County Jail as a pretrial detainee on a felony charge is 3–4 months. (Thomas, Tr. 516)

23. Each tank measures approximately 11 ft. by 21 ft., including the three cells and the common area. (Ahrens, Tr. 22; Plaintiffs' Ex. 23)

■ 24. The four-person cells inside the tanks contain approximately 42 to 48 square feet. (Gordon, Tr. 143)

25. The allocation of space per inmate in the Platte County Jail fails to meet constitutional standards.

26. The size of the cells in the Platte County Jail fails to meet constitutional standards.

■ 27. Clean bedding is not given to an inmate at admission, and clean mattresses are not provided. (Bergfalk, Tr. 323; Thomas, Tr. 486; Ahrens, Tr. 446)

28. Inmates are forced to sleep on filthy mattresses without mattress covers, sheets and pillow cases. (Ahrens, Tr. 16, 50; Camp, Tr. 355; Stipulation 7)

29. Constitutional standards in regard to clean quarters are not complied with in the operation of the Platte County Jail.

30. Blankets are rarely washed and are generally filthy. (Ahrens, Tr. 17; Reefer, Tr. 295; Stipulation 6)

31. When blankets are washed they are not disinfected. (Thomas, Tr. 470)

32. The Platte County Jail practices in regard to the issuance of adequate clean mattresses, sheets, blankets, towels, pillows, and pillow cases fail to meet constitutional standards.

33. Clothing is not provided for jail inmates. (Ahrens, Tr. 17, 18)

34. Inmates have to wash their own clothes in utility sinks located in their cells or tanks. (Ahrens, Tr. 19; Gordon, Tr. 138; Allen, Tr. 450, 451)

35. Towels and washcloths are generally not provided to inmates. (Stipulation 10)

36. Inmates are not given a tooth brush, soap and other items necessary for the maintenance of personal hygiene. (Bergfalk, Tr. 323; Ahrens, Tr. 18, 19; Allen, Tr. 438; Stipulation 9)

### Health and Safety

37. No emergency evacuation plan for fire or other disasters exists. (Gordon, Tr. 140; Bergfalk, Tr. 325).

38. Fire hazards exist at the Platte County Jail. (Gordon, Tr. 140, 141).

39. The jail has very old locks and security devices which are hard to manipulate and operate, and in case of fire or other emergency the danger to the jail personnel and inmates would be great. (Camp, Tr. 379; Amicus Curiae's Ex. 24).

40. A fire at the Platte County Jail would be especially serious because even if inmates were not endangered by flames and heat they would likely suffer asphyxiation because of the inadequate ventilation. (Gordon, Tr. 141).

41. There are no screens on the windows of the jail to prevent insect infestation. (Gordon, Tr. 122, 123; Ahrens, Tr. 15; Maase, Tr. 229, 230).

42. Some toilets lack toilet seats, and some do not even flush with sufficient force to remove human feces. (Gordon, Tr. 125, 126, 127; Plaintiffs' Ex. 30k).

43. The construction of the South Tank is such that the floor is frequently wet, slick, and hazardous, and these conditions have caused accidents serious enough to require treatment of inmates at a hospital. (Gordon, Tr. 128; Ahrens, Tr. 13, 14, 15; Aldridge, Tr. 60, 70).

44. The air in the jail is damp, still, and malodorous because there is no mechanical ventilation system. (Ahrens, Tr. 12; Gordon, Tr. 119; Maase, Tr. 230).

45. During part of the winter months of November and December, 1973, and January, 1974, there were 32 windows broken out on the south side of the jail. (Thomas, Tr. 483, 484; Stipulation 5).

46. Inmates in winter must either be subjected to damp, still, and foul-smelling air or to the discomforts of extreme cold since the building's windows provide the only means of ventilation. (Gordon, Tr. 119).

47. The jail is extremely cold in winter and hot in summer. (Ahrens, Tr. 11; Gordon, Tr. 152; Thomas, Tr. 518; see also Plaintiffs' Ex. 14, pages 8–9; Amicus Curiae's Ex. 36, pages 7–8, 16–17, 25–26, and Supplement; Amicus Curiae's Ex. 18, Chapter 1, page 5; Chapter 2, pages 8–12; Chapter 3, pages 13–14).

48. The west cell and the shower cell do not have any heat outlets. (Gordon, Tr. 120).

49. The filthy conditions at the Platte County Jail lead to infestation by insects, most notably roaches. (Gordon, Tr. 138, 139; Ahrens, Tr. 15).

50. The practices in the Platte County Jail in regard to detection and preventive measures to control or eliminate insects and roaches do not comply with constitutional standards.

51. The hot water heating apparatus is so inadequate that only two inmates at a time can take hot showers and, after that, only cold showers are available. (Ahrens, Tr. 13; Gordon, Tr. 131, 132; Camp, Tr. 355; Reefer, Tr. 296; see also Amicus Curiae's Ex. 36, pages 19–20, and Supplement; Amicus Curiae's Ex. 18, Chapter 7).

52. The materials and techniques used in the construction of the lavatory areas and the decayed condition of these areas make it difficult to clean so as to avoid conditions conducive to bacterial growth. (Gordon, Tr. 132, 133, 134).

53. The overall lighting level in the jail is inadequate. (Maase, Tr. 228; Gordon, Tr. 123, 124; Plaintiffs' Ex. 14, page 9).

54. The only outside light has to filter through wire mesh and filthy windows, and those windows are separated from the cells by a runway area and a set of bars. (Maase, Tr. 228; Plaintiffs' Ex. 23).

55. Artificial light consists of some bare bulbs hanging from the ceiling. (Maase, Tr. 228; Plaintiffs' Ex. 23).

56. The jail is extremely dirty and shows a heavy accumulation of filth which evidences a lack of a regular cleaning program. (Gordon, Tr. 135; Gagne, Tr. 169, 170; Camp, Tr. 355).

57. The only cleaning in the cell areas is by the inmates, and they are not provided with the cleaning equipment that they need. (Ahrens, Tr. 20, 21; Gordon, Tr. 137, 138; Thomas, Tr. 484, 485).

58. Cleaning equipment is provided to inmates on an irregular basis, making a routine sanitation program in the jail's living quarters impossible. (Ahrens, Tr. 20; Thomas, Tr. 485).

## Medical Care

59. No medical screening procedure is used when new inmates are incarcerated. (Stipulation 13; Twin, Tr. 256, 257; Ahrens, Tr. 28; Thomas, Tr. 504; Amicus Curiae's Ex. 38, page 7).

60. Inmates are exposed to disease because of the lack of medical screening to separate inmates who are ill upon incarcer-ation from the rest of the population. (Bergfalk, Tr. 323; Twin, Tr. 254, 255; Plaintiffs' Ex. 13, pages 5–7).

61. The entire jail population has been exposed to hepatitis because inmates are not given any medical screening upon incarceration. (Ahrens, Tr. 57; Twin, Tr. 255, 256; Thomas, Tr. 504).

62. All persons in the jail were required to receive shots as a result of their exposure to hepatitis. (Thomas, Tr. 504; Ahrens, Tr. 32).

63. Joseph L. Johnson was initially incarcerated on March 20, 1976, and as early as March 21, 1976, the corrections staff knew that he had a long history of epilepsy and required medication; however, Johnson suffered several seizures before finally receiving medical attention on April 6, 1976. (Twin, Tr. 244–247, 256; Plaintiffs' Ex. 33, 34; Mos, Tr. 283, 284).

64. There are no medical facilities or personnel at the jail. (Stipulation 13; Modlin, Tr. 417, 418; Amicus Curiae's Ex. 38, page 7).

65. A prisoner notifies the jailer when he desires to see a doctor and the jailer, a person with no medical training, decides what action is appropriate for any particular case. (Stipulation 14; Ahrens, Tr. 29; Reefer, Tr. 298).

66. The determination as to the necessity of immediate psychiatric treatment is made by jail personnel, none of whom have any psychiatric training. (Thomas, Tr. 497).

67. It is constitutionally insufficient to have a corrections officer with no medical training determine who receives medical care and treatment. (Twin, Tr. 256–7).

68. Inmates are exposed to athlete's foot and other skin diseases because of the improper drainage and the build-up of condensation in the lavatory areas. (Gordon, Tr. 128, 129).

69. Inmates are exposed to skin and scalp diseases because of the dirty mattresses. (Gordon, Tr. 136).

70. Inmates have had lice. (Twin, Tr. 256).

71. If an inmate gets lice, the corrections staff has no plan for a delousing program. (Gordon, Tr. 136; Twin, Tr. 256).

72. There is no health care system at the jail, but only a non-system that reacts to crisis in individual cases. (Twin, Tr. 254, 255, 259).

73. There is no system established at the jail for the distribution and control of prescription and non-prescription medications. (Twin, Tr. 254, 255).

### Psychological Conditions

74. Suicide attempts have occurred at the Platte County Jail (Camp, Tr. 372; Thomas, Tr. 498).

75. The conditions in the Platte County Jail substantially increase the likelihood of suicide attempts. (Camp, Tr. 372).

76. The Platte County Jail's lack of classification of prisoners and the physical make-up of the jail causes the non-criminal to be exposed to the criminal over extended periods of time, increasing the likelihood that the non-criminal will return to the criminal justice system after his release. (Camp, Tr. 373).

77. The physical conditions of the Platte County Jail (e. g., darkness, lighting, dinginess, lack of clean walls and floors, inadequate plumbing fixtures) create an extremely demeaning living environment; the results of living in such an environment are initially instability and an increased likelihood of hostility and later apathy as the inmate's self-respect and self-concept are depleted, all of which are psychologically damaging to the inmate. (Modlin, Tr. 410; Thomas, Tr. 510).

78. The lack of space in the Platte County Jail causes a complete loss of privacy for persons placed there which leads to the development of irritability and tension and an increase of friction between the inmates, thus increasing stress in inmates and the likelihood of fights between inmates. (Modlin, Tr. 408–409; Thomas, Tr. 510).

79. The stress of being confined in conditions like the Platte County Jail without the availability of exercise and/or physical activity upon the type of person who is usually found in jails is unusually severe and potentially harmful. (Modlin, Tr. 412–413).

80. Confinement in the Platte County Jail can cause bitter, warped attitudes in those persons confined there. (Modlin, Tr. 426).

### Food Service

81. Inmates receive a breakfast consisting only of two rolls and coffee at 7:30 a. m. (Ahrens, Tr. 26; Plaintiffs' Ex. 11; Allen, Tr. 437).

82. Inmates receive their second meal of the day at noon, and it normally is a frozen TV dinner. (Ahrens, Tr. 26; Plaintiffs' Ex. 11; Allen, Tr. 435, 437).

83. The evening meal, served at 3:30 p. m., is also normally a frozen TV dinner. (Ahrens, Tr. 26; Plaintiffs' Ex. 11; Allen, Tr. 435–437).

84. Inmates are required to go more than fifteen hours between dinner and breakfast. (Ahrens, Tr. 26).

85. Plaintiffs' Exhibit 11 is a fair and accurate representation of meals that were prepared and served in the Platte County Jail in 1974 and 1975 and are still being prepared and served to inmates. (Allen, Tr. 451, 452; Plaintiffs' Ex. 11).

86. When the diet of inmates at the Platte County Jail is analyzed for the nutrient composition and the results of that analysis are compared with accepted dietary allowance of essential nutrients for males, ages 23 to 50, that jail diet is found to be inadequate by about one-third of the national standards. (Jerome, Tr. 312, 313, 314; Plaintiffs' Ex. 11, 36).

87. An inmate receiving the diet at the Platte County Jail over an extended period of time would suffer from malnutrition, poor health, and disease. (Jerome, Tr. 314).

88. The meal service is totally inadequate both as to the quality and the manner in which meals are served. (Amicus Curiae's Ex. 38, page 6).

89. The Platte County Jail food service facilities are not in compliance with the regulations governing food sanitation promulgated by the Missouri Division of Health, Department of Social Services. (Gordon, Tr. 144; Plaintiffs' Ex. 26, 29).

90. Failure on the part of the jail to comply with health department standards increases the chance of occurrence and progression of food-borne disease. (Gordon, Tr. 148, 149; Plaintiffs' Ex. 26, 29).

91. All meals served to the inmates at the Platte County Jail are served to them in the cell tank area. (Allen, Tr. 438, 460; Reefer, Tr. 296; Amicus Curiae's Ex. 38, page 6).

### Correctional Officers

92. Those hired as guards receive no specific training to prepare them for their duties as a guard in a detention facility. (Stipulation 24; Reefer, Tr. 301).

93. There are no written policies or procedures to guide jail personnel in responding to disturbances and other emergency situations. (Bergfalk, Tr. 325).

94. The facilities for guard supervision of inmates are inadequate because of the layout of the Platte County Jail. (Maase, Tr. 229).

95. A security problem exists because the lights are totally within the control of the inmates. (Masse, Tr. 229; Thomas, Tr. 480).

96. The Platte County Jail has insufficient staff to properly provide for the protection and supervision of inmates. (Thomas, Tr. 476, 477).

97. Closed circuit television cameras are used, but they do not assist in surveillance of inmate living areas; rather, the cameras focus on the runway areas surrounding the tanks which are inaccessible to inmates. (Gagne, Tr. 183; Bergfalk, Tr.. 322, 323; Ahrens, Tr. 7; Plaintiffs' Ex. 23).

98. Open, multiple-cell areas (the tanks) are the predominant form of housing in the Platte County Jail. (Bergfalk, Tr. 322; Plaintiffs' Ex. 23).

99. During the evening and early morning hours, only one officer is on duty, and he is under instructions from Sheriff Thomas not to go back into the tank areas until he receives assistance from another officer. (Gagne, Tr. 206; Twin, Tr. 259, 260; Bergfalk, Tr. 324; Thomas, Tr. 503; Aldridge, Tr. 70–72).

100. If an inmate is injured in the Platte County Jail during the evening or early morning hours, help is not available to him until the single guard on duty can contact other officers to come to the jail and act as back-up for the single guard. (Thomas, Tr. 477, 478, 503; Aldridge, Tr. 70–72).

101. Inmates have had to wait three hours to receive help when a medical emergency has arisen at night. (Aldridge, Tr. 70, 71, 72; Thomas, Tr. 503).

102. Fights between inmates do occur and have been severe enough to cause serious injuries to inmates. (Aldridge, Tr. 73; Ahrens, Tr. 49, 64; Thomas, Tr. 506).

103. MACE and tear gas are used to punish inmates. (Ahrens, Tr. 45, 46, 47, 54, 61; Thomas, Tr. 481).

104. Tear gas has been used in such quantities that two inmates were required to be taken to a hospital and its effect lingered for three weeks in the tank area. (Ahrens, Tr. 46; Thomas, Tr. 481; Defendants' Answer, Paragraph 22).

105. Inmates of entire tank areas are punished for actions that corrections officers know to be the action of one individual, even when the officers know who that individual is. (Ahrens, Tr. 43; Stipulation 23).

### Discipline and Grievance Procedures

106. There is no regular practice of giving all inmates copies of jail rules, making copies available to them or making inmates aware in any other way of those rules that delineate the behavior expected of them. (Bergfalk, Tr. 326; Ahrens, Tr. 42; Amicus Curiae's Ex. 38, page 9; Thomas, Tr. 478, 516, 517).

107. There are no established procedures for the imposition of discipline and, specifically, no hearing is granted prior to meting

out sanctions. (Bergfalk, Tr. 326; Ahrens, Tr. 42).

108. The sheriff has withheld commissary privileges from an entire tank in situations where he has been unable to determine who among the group acted in a manner to cause the sheriff to take such action. (Stipulation 23).

109. There is no formalized complaint procedure for addressing inmate grievances. (Bergfalk, Tr. 326, 327; Ahrens, Tr. 49, 50, 51; compare Plaintiffs' Ex. 2, page 37).

### Classification

110. The Platte County Jail inmates include those held for traffic violations, misdemeanors and felonies, including pretrial detainees, sentenced inmates, and parole violators. (Ahrens, Tr. 24; Defendants' Ex. 1).

111. For a substantial number of detainees housed at the Platte County Jail, detention was not necessary. (Allen, Tr. 467; Thomas, Tr. 489).

112. There is no established procedure for classifying prisoners in order to segregate them according to offense, age, background, or special need, and no information is obtained from inmates upon incarceration to use as a basis for such a classification. (Ahrens, Tr. 24, 25, 42; Gagne, Tr. 178, 179; Bergfalk, Tr. 323, 324; Thomas, Tr. 496; Stipulation 25).

113. The design of the facility does not yield a sufficient number of separate areas to allow proper segregation of men from women, and adults from juveniles, and to separate non-criminals, first offenders, those charged with a serious crime, escape risks, and inmates with special needs. (Bergfalk, Tr. 321; Maase, Tr. 227; Thomas, Tr. 496; Plaintiffs' Ex. 23).

114. Juveniles have been housed at the Platte County Jail. (Allen, Tr. 455; Thomas, Tr. 495; Defendants' Ex. 1).

115. Juveniles were normally housed in the two-person cells known as the shower cell, west cell, and front cell. (Ahrens, Tr. 9, 10; Plaintiffs' Ex. 23).

116. Adult prisoners, visitors, and guards could see into cells used to detain juveniles and have a view of the toilet areas in those cells. (Ahrens, Tr. 9; Maase, Tr. 227; Amicus Curiae's Ex. 38, page 10).

117. Juveniles detained in the west, shower, and front cells could do nothing to gain privacy. (Ahrens, Tr. 9, 10).

118. Women were normally housed in the two-person cells known as the shower cell, the west cell, and the front cell. (Ahrens, Tr. 9, 10; Plaintiffs' Ex. 23).

119. Male prisoners, visitors, and guards could see into cells used to detain women, and have a view of the toilet areas in those cells. (Ahrens, Tr. 9; Maase, Tr. 227; Amicus Curiae's Ex. 38, page 10).

120. Women detained in the west, shower, and front cells could do nothing to gain privacy. (Ahrens, Tr. 9, 10).

121. When a woman is detained in the jail, a matron should be present in the facility at all times. (Gagne, Tr. 175; Bergfalk, Tr. 324).

122. There is never a matron on duty at night to attend to emergency problems of female inmates. (Thomas, Tr. 476, 477).

123. The present facilities for women are inadequate because of the lack of privacy. (Bergfalk, Tr. 322, 324; Maase, Tr. 227).

### Recreation, Work, Education, Training and Counseling Programs

124. Prisoners are confined to the tank areas at all times with no access to any areas outside the tank areas for recreational or exercise purposes. (Stipulation 15; Reefer, Tr. 296).

125. No area is provided for exercise or recreation. (Stipulation 11; Bergfalk, Tr. 328; Maase, Tr. 228, 229; Reefer, Tr. 307).

126. No games or entertainment are provided. (Stipulation 11; Ahrens, Tr. 20, 21).

127. There are no programs or facilities for counseling, rehabilitation, or education. (Stipulation 12; Gagne, Tr. 171, 172; Ahrens, Tr. 25; Reefer, Tr. 296, 297, 307).

128. There is a definite need for counseling services and crisis intervention in the Platte County Jail. (Camp, Tr. 365; Modlin, Tr. 415).

129. The lack of academic, work release, and rehabilitation programs increases the possibility of an inmate returning to the criminal justice process. (Camp, Tr. 374).

130. An inmate has no access to religious services of his choice. (Bergfalk, Tr. 328; Ahrens, Tr. 26; see also Amicus Curiae's Ex. 38, page 9; compare Plaintiffs' Ex. 2, pages 40–41).

### Legal Assistance

131. The lack of private facilities in the Platte County Jail for conferring with his client hinders an attorney in his representation of criminal defendants. (Mos, Tr. 269, 271, 272).

132. There is no legal library available for inmates at the Platte County Jail. (Ahrens, Tr. 40).

133. Legal pads, envelopes, and stamps are not made available for inmates. (Ahrens, Tr. 40; Allen, Tr. 462).

134. Inmates are denied use of telephones, copying machines, and notary publics when these things are necessary for the processing of their court cases. (Ahrens, Tr. 36, 37).

### Communication and Visiting

135. Inmates were asked to sign a consent form to allow jail officials to open their mail. (Stipulation 18; Reefer, Tr. 299; Plaintiffs' Ex. 8).

136. Inmates who refused to sign this consent form were not permitted to correspond with anyone except attorneys, courts, and ministers. (Stipulation 19; Ahrens, Tr. 33, 34; Reefer, Tr. 299; Plaintiffs' Ex. 8).

137. At one time it was the practice at the Platte County Jail to open and read all incoming and outgoing mail. (Stipulation 20; Ahrens, Tr. 33, 34; Reefer, Tr. 299; Allen, Tr. 448; Plaintiffs' Ex. 8).

138. Inmates are limited in the number of people to whom they can correspond. (Aldridge, Tr. 74, 75; Allen, Tr. 461; Plaintiffs' Ex. 8).

139. Visitation is accomplished for inmates in two-person cells by requiring the visitor to speak to the inmate through a grilled hole in a closed cell door. (Gagne, Tr. 194; Bergfalk, Tr. 327; Amicus Curiae's Ex. 38, page 10).

140. Visitors to inmates in the tanks must stand in the bullpen area while the inmate stands in the tank with two sets of barred and locked doors between them. (Plaintiffs' Ex. 23; Gagne, Tr. 194; Ahrens, Tr. 36, 37; Bergfalk, Tr. 327; compare Plaintiffs' Ex. 2, page 42).

141. Visitors can see the toilet areas in each of the tanks. (Gagne, Tr. 195; Thomas, Tr. 483; Plaintiff's Ex. 23).

142. Inmates detained in the tanks and their visitors are separated by a distance of six feet and two sets of barred and locked doors. (Plaintiffs' Ex. 23; Gagne, Tr. 195; Ahrens, Tr. 36, 37; Amicus Curiae's Ex. 38, page 10; compare Plaintiffs' Ex. 2, page 42).

143. The physical setting for visiting is simply impossible. (Amicus Curiae's Ex. 38, page 10).

144. There is no opportunity for privacy of communications between inmates and their visitors. (Ahrens, Tr. 38; compare Plaintiffs' Ex. 2, page 42).

145. Visitation, such as it is, is only permitted one time per week. (Stipulation 21, Plaintiffs' Ex. 8; Reefer, Tr. 300; Thomas, Tr. 473, 474, 516; Amicus Curiae's Ex. 38, page 10).

146. The length of the visit is dependent upon the total number of visitors to all inmates. (Thomas, Tr. 474).

### VI.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter pursuant to the provisions of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4) and 28 U.S.C. §§ 2201 and 2202. Rhem v. Malcolm, 507 F.2d 333 (2nd Cir. 1974); Hamilton v. Love, 328 F.Supp. 1182 (E.D. Ark.1971).

2. The plaintiffs in this action adequately represent the class of inmates in the Platte County Jail and appropriately bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala. 1966), *aff'd sub nom. Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Hamilton v. Love, supra*; *Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975).

■ 3. An inmate, whether already convicted or merely detained pending trial, retains all rights of an ordinary citizen except those expressly or by necessary implication taken from him by law. *Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944); *Rhem v. Malcolm,* 371 F.Supp. 594, 622 (S.D.N.Y. 1974), *aff'd and remanded,* 507 F.2d 333 (2nd Cir. 1974).

■ 4. A pretrial detainee retains all rights of the ordinary citizen except those necessary to assure his appearance for trial. *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951); *Rhem v. Malcolm,* 371 F.Supp. at 622.

■ 5. A detainee enjoys all the constitutional rights of a defendant on bail awaiting trial, and any curtailment of those rights must be justified to the extent such denial is required to insure that he appears at trial. *Brenneman v. Madigan,* 343 F.Supp. 128, 137–38 (N.D.Cal.1972).

■ 6. The actions of the defendants, which may contravene the Eighth Amendment's prohibition against cruel and unusual punishment, may be enjoined under 42 U.S.C. § 1983.

7. The question of whether particular actions of the defendants may constitute cruel and unusual punishment must be determined by giving appropriate consideration to an evolving standard of decency that marks the progress of a maturing society. *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

■ 8. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

9. The conditions of confinement for detainees in the Platte County Jail must be consistent with the least restrictive means of achieving the purpose (physical custody for appearance at trial) requiring and justifying the deprivation of liberty. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *Hamilton v. Love, supra,* at 1192; *Miller v. Carson, supra,* at 866.

[11] 10. The restrictive conditions under which detainees are held under the factual circumstances of this case constitute punishment subjecting detainees of the Platte County Jail to conditions which violate the due process of law guaranteed by the Fifth and Fourteenth Amendments and the proscription against cruel and unusual punishment of the Eighth Amendment. *Miller v. Carson, supra* ; 4 *Blackstone Commentaries* 300; Note, "Constitutional Limitations on the Conditions of Pretrial Detention," 79 Yale Law Journal 941 (1970).

11. The conditions of confinement for detainees in the Platte County Jail violate the due process and equal protection clauses of the Fourteenth Amendment. *Jones v. Wittenberg,* 323 F.Supp. 93, 100 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972); *Hamilton v. Love, supra; Rhem v. Malcolm,* 507 F.2d at 336.

12. Confinement itself within the Platte County Jail, in light of the totality of the conditions of confinement found to exist, amounts to cruel and unusual punishment prohibited by the Eighth Amendment to the Constitution, in that the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people. *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970) (*Holt II*), *aff'd* 442 F.2d 304 (8th Cir. 1971) (*Holt III*).

■ 13. Pretrial detainees do not stand on the same footing as convicted inmates. Subjecting pretrial detainees to restrictions and privations other than those inherent in their confinement itself or which are justified by compelling necessities of jail administration is a violation of the due process

and equal protection clauses of the Fourteenth Amendment. *Rhem v. Malcolm,* 507 F.2d at 336.

14. In violation of the equal protection and due process clauses of the Fourteenth Amendment, the conditions that presently exist in the Platte County Jail subject the detainees to worse conditions and deprivation than inmates incarcerated in the state penitentiary after conviction of a charge. *Rhem v. Malcolm, supra,* at 336; *Miller v. Carson, supra,* at 893.

15. The conditions for detention must not only be equal to but superior to those permitted for prisoners serving sentences for the crimes that they have committed against society. *Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 686 (D.Mass.1973), aff'd 494 F.2d 1196 (1st Cir. 1974); *Hamilton v. Love, supra,* at 1191; *Jones v. Wittenberg,* 323 F.Supp. at 100.

16. The imposition of maximum security confinement of detainees when it is not necessary violates their rights to due process and to be free from cruel and unusual punishment by punishing them although they are unconvicted, and violates their rights to equal protection of the laws by unnecessarily treating them more harshly than those convicted. *Rhem v. Malcolm,* 371 F.Supp. at 624; *Brenneman v. Madigan, supra,* at 131; *Hamilton v. Love, supra,* at 1182; *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971), aff'd sub nom. *Jones v. Metzger, supra; Hamilton v. Landrieu,* 351 F.Supp. 549, 552 (E.D.La.1972).

17. Inadequate resources can never be an adequate justification for the State's depriving any person of his constitutional rights. *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir. 1974); *Hamilton v. Love, supra,* at 1194; *Jones v. Wittenberg,* 330 F.Supp. at 712; *Rhem v. Malcolm,* 507 F.2d at 341.

18. The conditions to which detainees are subjected in the Platte County Jail violate the due process and equal protection clauses of the Fourteenth Amendment. *Rhem v. Malcolm,* 371 F.Supp. 594; *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971); *Hamilton v. Love, supra.*

19. The lack of any substantial medical facilities at the Platte County Jail violates due process, equal protection, and the Eighth Amendment's prohibition against cruel and unusual punishment. *Jones v. Wittenberg,* 330 F.Supp. at 718; *Miller v. Carson, supra,* at 876–79.

20. The total lack of recreation and exercise facilities and programs at the Platte County Jail violates due process. *Brenneman v. Madigan, supra,* at 140; *Jones v. Wittenberg,* 330 F.Supp. at 717; *Hamilton v. Landrieu, supra; Taylor v. Sterrett,* 344 F.Supp. 411, 422 (N.D.Tex. 1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir. 1974); *Hamilton v. Love, supra,* at 1193.

21. Confinement in the Platte County Jail without an opportunity for regular outdoor exercise constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Sinclair v. Henderson,* 331 F.Supp. 1123, 1129 (E.D.La.1971).

22. The lack of facilities for private attorney-client consultations and the total lack of a law library at the Platte County Jail deny inmates their Sixth Amendment right to access to the courts. *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) aff'g *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970); *Procunier v. Martinez,* 416 U.S. 396, 419, 422, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Miller v. Carson, supra,* at 885–886; *Brenneman v. Madigan, supra,* at 139.

23. The defendants' restriction on visitation and the facilities for visitation are not justified by any legitimate governmental interest; the restrictions result in the nature of a detainee's confinement and are not reasonably related to the purpose of confinement. *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435; *Rhem v. Malcolm,* 371 F.Supp. at 625–626; *Jones v. Wittenberg,* 330 F.Supp. at 717; *Brenne-*

man v. Madigan, supra, at 141; *Inmates of Suffolk County Jail v. Eisenstadt, supra.*

■ 24. The defendants' facilities for visitation and restriction of visitation violate the plaintiffs' First Amendment rights to communicate with friends and relatives. *Jackson v. Godwin,* 400 F.2d 529, 541 (5th Cir. 1968); *Brenneman v. Madigan, supra,* at 141; cf. *Procunier v. Martinez,* 416 U.S. 396, 407, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224, 237 (1974).

25. The defendants' restrictions on visitation are greater than are necessary to protect the governmental interest of security, and the defendants provide no other adequate means of communication between prisoners and their families. *Procunier v. Martinez, supra; Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

■ 26. Past practices of the Platte County Jail in regard to the manner of handling inmate mail and placing a limitation on the amount of outgoing mail are a violation of the inmates' and their correspondents' First Amendment rights. *Jones v. Wittenberg,* 330 F.Supp. at 719. *See also, Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976).

■ 27. Past practices of the Platte County Jail in denying indigent inmates writing materials and postage are a denial of due process and equal protection. *Jones v. Wittenberg,* 330 F.Supp. at 719.

## VII.

## REMEDY

Consistent with the exemplary and commendable cooperation accorded this Court by counsel for the parties, we have been greatly assisted in our preparation of the final judgment and decree in this case. At the Court's direction, counsel for plaintiffs and amicus curiae (the Missouri Association for Social Welfare) presented a proposed final judgment and decree. Counsel for defendants, at the Court's direction, responded specifically to plaintiffs' and amicus curiae's proposed final judgment and decree, indicating their view of each paragraph thereof and suggesting modification of particular language which, in the event of an adverse judgment, they deemed to be more practicable than that suggested by plaintiffs and amicus curiae.

Comparison of the submissions of counsel with the final judgment and decree of the Court will show that we have incorporated most of the suggestions made by the defendants. Such a comparison will also show that we did not accept all suggestions made by the plaintiffs. Indeed, in some instances we agreed with defendants' suggestion that particular suggestions of substance made by plaintiffs and amicus curiae should not be accepted under the circumstances.

Plaintiffs and amicus curiae, for example, proposed that the existing Platte County Jail, even after particular changes were made, should be used only as a holding facility for a period of no longer than twenty-four hours. While it is this Court's judgment that it is not constitutionally permissible for the present Platte County Jail to be used for convicted and sentenced prisoners, we are convinced that, assuming that the changes required by the final judgment and decree are made, it may be used for pretrial detainees for a period of time, under ordinary circumstances, not to exceed seven days. In our judgment, a use limitation of twenty-four hours would, as a practical matter, be equivalent to an immediate and absolute closing of the present facility for all purposes. We do not believe that equity requires such a drastic remedy.

The final judgment and decree does prohibit the future confinement of women and juveniles for any length of time beyond a short holding period while appropriate arrangements can be made for transfer to some other detention facility. But that prohibition merely codifies our understanding of the present practice in Platte County and, in any event, is constitutionally required because of the physical construction of the present jail. In our judgment, the same considerations are not applicable to male adult pretrial detainees. Equity requires that the Platte County officials be permitted to continue to house those per-

sons in accordance with the final judgment and decree until the new facility is constructed and in operation.

We have also rejected particular suggestions made by plaintiffs and amicus curiae in regard to the operation of the new facility to which defendants have objected. Specifically, we have refused to make mandatory provisions for group and individual counseling programs; for basic and remedial educational programs; and for programs for work release, vocational training release, and educational release. Had defendants not objected to those particular paragraphs, we would have included them in the final judgment and decree. For we are satisfied that such programs are calculated to pay dividends in the control and prevention of crime. We are not, however, convinced that such programs are mandated as a matter of constitutional law. The language of the paragraphs relating to those programs has therefore been stated in permissive rather than mandatory terms.

We have also made substantial changes in regard to judicial supervision of the new facility. We do so for the reason that defendants' adoption of the major portion of plaintiffs' and amicus curiae's suggestions in regard to the new facility establishes that defendants intend to operate the new facility in accordance with more than minimal constitutional standards. Indeed, we believe that it can fairly be said that, generally speaking, the Sheriff and his limited staff have attempted to do the best they could with the present facility consistent with the limited financial resources which have been allocated for the operation of the jail.

We therefore believe that once we approve the plans and specifications for the new facility and the new Grievance Procedures to be submitted under the final judgment and decree, existing law generally applicable to the enforcement of federal court judgments and decrees will be sufficient under the circumstances.

The National Juvenile Law Center, located in St. Louis, Missouri, as amicus curiae, submitted suggestions in regard to various provisions which it believed should be included in the final judgment and decree in the event juveniles are to be held in the new facility. We have not covered the subject of juvenile detention in any detail in the final judgment and decree for the reason that it is our understanding that the Circuit Court of Platte County, Missouri recognized a long time ago that the present jail was not a proper facility for the housing of juveniles and that, accordingly, an appropriate cooperative arrangement was established for housing juveniles outside Platte County.

It is our further understanding that the Circuit Court of Platte County and other officials in Platte County presently recognize the benefits of the present cooperative arrangement, that they wish to avoid the cost of duplicating juvenile facilities already available, and that they therefore do not intend to change existing juvenile arrangements when the new Platte County Jail is constructed. Should the Court's understanding of the situation in regard to juveniles be inaccurate, counsel will be directed to advise the Court promptly so that, if necessary, the present final judgment and decree may be modified accordingly.

It should be obvious to everyone concerned that the construction, maintenance and operation of a dual purpose institution to serve both adults and juveniles requires substantially different and more expensive facilities than one designed and maintained to serve only adults. Counsel for defendants will therefore be directed to file a report with the Court on the subject of intended juvenile detention as above stated.

For the reasons stated, it is

ORDERED (1) that the Clerk shall, in accordance with Rule 58 of the Federal Rules of Civil Procedure, enter the final judgment and decree attached hereto as part VIII of this memorandum opinion. It is further

ORDERED (2) that counsel for defendants shall within twenty (20) days file an appropriate report as discussed in Part VII above in regard to whether there is any

intention to house juveniles in the new Platte County Jail. It is further

ORDERED (3) that within twenty (20) days of this order, the requirements of paragraph 71 of Part II of the final judgment and decree relating to a Grievance Procedure shall be compiled with. It is further

ORDERED (4) that within twenty (20) days of this order, counsel for the parties shall submit the lists from which the panel provided for in paragraph 75 of Part III of the final judgment and decree will be selected. It is further

ORDERED (5) that counsel for plaintiffs are granted leave to file an appropriate application for attorneys' fees and expenses as they deem may be authorized by law.

## VIII.

## FINAL JUDGMENT AND DECREE

### Part I

*Minimum Constitutional Standards for the Present Platte County Jail*

The present Platte County Jail facility shall immediately cease being operated for any purpose except in the following instance, and then only when the following provisions are met:

A. The present jail facility may be used only as a pretrial holding facility for persons charged with criminal offenses. Except when the length of trial may so require, no person shall be confined in the present facility for longer than seven (7) days and any person so confined shall, after that period of time, be transferred to another detention facility located within thirty-five (35) miles of Platte County, Missouri, which substantially meets the minimum constitutional standards stated in Part II of this Final Judgment and Decree.

1. Before an individual may be confined in the Platte County Jail, he must receive an adequate pre-detention physical examination by trained health personnel to determine the possibility of infectious or contagious disease or other medical problems.

2. Before individuals may be housed in the present jail, that facility must be thoroughly cleansed and sanitized with plumbing maintained in workable order.

3. The present jail must be inspected by health personnel, with a report to be filed with the Court not less often than every six months.

4. There must be supervision of all cells by correctional officers (sheriff's deputies) on a continuous basis. This supervision must be 24-hour personal observation by a correctional officer and cannot be complied with by utilization of television cameras which are presently in operation.

5. Neither women nor juveniles may be housed in the present jail for any period of time other than the time necessary to arrange for transfer to some other appropriate detention facility.

6. Clean bed linen and mattresses must be provided to each detainee upon his arrival at the present jail facility.

B. The present jail may no longer be used for housing women or juveniles other than for the short period of time above stated.

### Part II

*Minimum Constitutional Standards for the New Platte County Jail*

*Physical, Health and Safety Conditions*

1. There shall be single occupancy cells, with a minimum of 70 square feet, each equipped with a bed off the floor, a working toilet that flushes from the inside, and a wash basin with hot and cold running water.

2. There shall be a ventilation system throughout the living areas of detainees that will provide fresh air and maintain proper heat in the winter time and provide cooling in the summer months.

3. The new facility shall meet all local and State fire, safety, sanitation, electrical, plumbing, and building codes.

4. The new facility shall be subject to inspections as may be required by law by

officials of the appropriate Health, Fire, and other Departments, State and local, in order to ensure compliance with all applicable State and local laws.

5. An appropriate day room shall be provided that will allow for movement outside the individual cell areas.

6. An appropriate facility for indoor exercise and recreation shall be established for use by the detainees.

7. An appropriate area shall be provided for outside recreation.

8. An emergency evacuation plan shall be established for fire or other disaster.

9. The new facility shall be cleaned on a daily basis.

10. Detainees shall be provided, on a daily basis, cleansing powder, mops, and brooms for the maintenance of the detainees' living area.

11. An adequate insect control program shall be established and regularly maintained to prevent infestation by insects and rodents.

12. Upon a detainee's admittance to the Platte County Jail, all items which are necessary for personal hygiene shall be issued free of charge, including but not limited to soap, toothpaste, razors, sanitized mattress and pillow, shirt and pants, clean sheets, blankets and towels.

13. There must be adequate lighting in the new facility.

14. There must be a sufficient number of showers and sufficient hot water so that detainees may receive showers on a daily basis. Showers shall be maintained in a safe and sanitary manner.

15. Each cell shall be furnished with a mirror for the purpose of shaving and personal hygiene.

16. Each detainee shall be furnished with a space or locker for storing personal items, including clothing.

17. Each cell shall be equipped with a lock which can be operated and locked by the detainee from inside the cell and also controlled by correctional officers.

*Medical Care*

18. All detainees shall receive an appropriate medical screening examination at the time of admission.

19. A physician shall be available on a 24-hour basis.

20. A physician, registered nurse, or other public health trained personnel shall visit the jail at least once a week to have sick call and examine detainees.

21. There shall be sick call on a daily basis to determine which detainees require the services of a doctor and to provide treatment and necessary emergency care.

22. Untrained correctional officers shall not make final medical decisions in regard to whether detainees are in need of medical care.

23. There shall be an established procedure for maintaining medical records for each detainee and for controlling and dispensing medication. There shall be a log maintained that will indicate which detainee has received medication, the name of that medication, the amount of the dose, and the frequency with which he received it.

24. An appropriate unit shall be maintained to provide adequate facilities for medical examination.

25. There shall be housing units available for detainees with psychiatric or psychological problems or other medical problems who need to be housed in a special medical unit, where they may be supervised on a 24-hour basis by properly trained staff.

26. There shall be an established procedure for handling emergency medical problems on a 24-hour basis, seven days a week, so that the detainees who are in need of emergency medical care may receive speedy and proper medical treatment.

27. Detainees shall be furnished special diets as prescribed by their physician or any other member of the jail medical staff.

*Food Services*

28. The advice of a trained dietician, nutritionist, or food director shall be sought

regularly to review the food menus, preparation, and service.

29. All individuals involved in the preparation, handling, or service of food to detainees shall meet the minimum public health standards for employees working in restaurants serving the public.

30. Food shall be stored, prepared, and served fresh at the proper temperature, and there shall be a reasonable variety and quantity.

31. Detainees shall be furnished appropriate space for taking meals.

32. All meals served in the jail shall meet appropriate minimum nutritional standards.

33. The jail kitchen shall be inspected monthly by the Platte County Health Department or another agency approved by the Court.

34. Three daily meals shall be served on a regular basis.

*Correctional Officers*

35. Correctional officers or deputies who will work in the jail shall be selected on the basis of merit.

36. Appropriate programs shall be established for the training of correctional officers or deputies who will work in the jail.

37. The new facility must be supervised by adequately trained correctional officers or deputies on a 24-hour basis.

38. There shall be sufficient officers on duty at all times to provide safety and security for all detainees so that a correctional officer may enter the detainees' living area, if necessary, on a 24-hour basis.

39. There must be a matron on call 24 hours daily if women are detained in the new facility.

40. There shall be adequate correctional staff on duty to protect against assaults of all types by detainees upon other detainees.

*Classification*

41. An appropriate classification procedure shall be established and maintained in the new facility, under which detainees shall be classified according to their individual needs.

42. So far as practicable, pretrial detainees shall not be housed in the same cell with any person serving a sentence.

43. An appropriate screening procedure shall be established under which correctional officers will interview each detainee so that the detainee may properly be classified according to age, sex, previous offense, pretrial or sentenced, special problems (such as alcoholism, drug abuse, mental illness, narcotic addiction, sexual deviance, or suicide risk), or any other classifications which the screening officer may deem necessary for the safety of the detainee and the operation of the jail.

44. Information obtained in the pre-admission medical screening must be considered in classifying detainees.

45. The screening officer shall make appropriate inquiry in regard to whether an individual may be able to make bond or is eligible for release on recognizance and, if appropriate, shall advise him of his rights in regard thereto.

46. The screening officer shall make appropriate inquiry in regard to whether the detainee has any psychological or counseling problems which need the attention of the correctional staff and shall make an appropriate report to the correctional staff in regard thereto.

*Recreation, Work, Education, Training and Counseling Programs*

47. Appropriate and adequate exercise and outdoor recreation shall be permitted each day, weather permitting.

48. Appropriate and adequate exercise and indoor recreation shall be permitted each day.

49. There shall be a library available to detainees. There shall be no censorship of newspapers, books, or periodicals supplied to, purchased by, or given to detainees.

50. Any group and individual counseling programs which may be established shall be staffed by properly trained professionals.

51. Basic and remedial education programs may be established in the new facility.

52. Work release, vocational training release, and educational release programs may be established for the new facility.

53. An appropriate crisis intervention program may be established in the new facility.

*Legal Services and Preparation for Trial*

54. There shall be space available for private consultation between detainee and legal counsel.

55. All communications between counsel and detainee by telephone, letter, or personal visit must be uncensored, unmonitored, and confidential.

56. Detainees shall have complete access to all legal papers.

57. There shall be provision for telephone communication, unmonitored, between counsel and detainee on a daily basis.

58. There shall be access to a law library as required by law.

59. There shall be no curtailment of the number of times that an attorney may visit with his client.

60. Notary Public Service shall be provided detainees who wish to file legal pleadings in court.

61. Paper and pens shall be provided detainees for the purposes of corresponding with counsel or filing appropriate pleadings in court proceedings.

62. Detainees shall be allowed to shower, shave, and receive clean clothes before appearing before any jury.

*Visiting and Communication*

63. There shall be no limit on the number of letters a detainee may receive or send.

64. Absent exceptional circumstances, there shall be no censorship of outgoing mail; incoming mail may be inspected for contraband only by opening the letter in the presence of the detainee and without reading or censoring its contents.

65. Detainees shall be supplied pens and writing paper.

66. There shall be not less than weekly visiting in a space separated from the cell areas, allowing for private conversations with family and friends.

67. There shall be an opportunity to make and receive unmonitored telephone calls.

*Religious Freedom*

68. Detainees whose religious faiths dictate that they may not eat certain foods may be supplied a diet that will take into consideration their religious beliefs (i. e., Muslims and pork).

69. There shall be an opportunity within the jail to attend religious services and to receive religious counseling.

*Disciplinary and Grievance Procedures*

70. Each detainee shall receive a copy of all rules and regulations outlining the conduct required of the detainee. These rules shall include a list of prohibited conduct which may warrant certain disciplinary actions, which conduct shall be specifically defined.

71. Defendants shall promptly prepare and submit for the Court's approval an appropriate rule and regulation which shall contain provisions for a Grievance Procedure. Counsel for the parties shall attempt to agree upon the provisions of the Grievance Procedure before defendants shall submit the same to the Court for approval.

72. An ombudsman may be established to hear and investigate grievances of detainees and to make appropriate reports to the sheriff.

### Part III

*Enforcement of the Judgment and Decree*

73. The Court shall appoint a panel comprised of three persons to make appropriate inspections of the present Platte County Jail and to recommend the changes necessary for compliance with Part I of this

Judgment and Decree. Such panel may later be requested to assist the Court in its review and approval of the plans and specifications for the new Platte County Jail.

74. The panel shall file a written report of its findings with the Court, with copies to all counsel, after each inspection that it may deem necessary, until further order of the Court.

75. The panel shall be selected in the following manner:

(a) Plaintiffs and amicus curiae shall submit a list of proposed members from which the Court shall select one member. Counsel for plaintiffs are eligible for appointment.

(b) Defendants shall submit a list of proposed members from which the Court shall select one member. Counsel for defendants are eligible for appointment.

(c) The Court, after consultation with counsel, shall select a third member who shall hav. experience in adult and juvenile corrections, to serve as chairman.

(d) The members of the panel shall be reimbursed for any actual and reasonable expenses.

76. The Court shall retain jurisdiction of this action and may order other appropriate relief it deems necessary.

## ORDER STAYING EXECUTION OF JUDGMENT

Reports in the public media which have come to this Court's attention suggest that defendants are apparently under the impression that the only correctional institution available for the housing of persons charged or convicted in the Circuit Court of Platte County, Missouri, during the transition period contemplated by this Court's final judgment and decree, entered June 3, 1977, is the Jackson County Jail.

The testimonial evidence adduced at the trial of this case established without apparent dispute that the Municipal Correctional Institution maintained by the City of Kansas City, Missouri, complies with constitu-tional standards and would be available under an appropriate contractual working arrangement for the housing of persons charged and convicted in the Circuit Court of Platte County, Missouri.

Dr. Camp testified that he was familiar with the Municipal Correctional Institution of Kansas City, Missouri, that he believed it to be a sufficient and adequate facility and one which operated a proper program [Tr. 394–395]. Mr. Gagne, the head of the Municipal Correctional Institution, testified that, pursuant to appropriate contractual working arrangements, the Municipal Correctional Institution of Kansas City, Missouri, presently houses all women pretrial detainees and all convicted women offenders in cases which pended and were tried in Jackson County, Missouri [Tr. 184]. He testified that the same thing was true in regard to persons convicted of State offenses in the Circuit Court of Clay County, Missouri [Tr. 185]. Further testimony established that a number of persons charged and convicted of violations of city ordinances in cities other than Kansas City, such as Independence, Blue Springs, and other nearby jurisdictions, are held in that institution [Tr. 188].

The Municipal Correctional Institution of Kansas City, Missouri, pursuant to a contract with the federal government, is regularly designated by this Court as an institution in which persons convicted of federal offenses shall serve their sentences [Tr. 188].

Mr. Gagne further testified that the Municipal Correctional Institution of Kansas City, Missouri had quite a bit of excess room at the present time [Tr. 186]. Mr. Reefer, the Director of the Community Services Department of Kansas City, Missouri, presented detailed testimony in regard to the present contractual relationships which exist between the City of Kansas City, Missouri, and Jackson County, Missouri, Clay County, Missouri, the City of Independence, Missouri, the federal government, and other governmental units, under which persons charged and convicted of violations of State or federal laws are present-

ly being held in the Municipal Correctional Institution of Kansas City, Missouri. Mr. Reefer testified that he was unaware of any legal impediment which would stand in the way of a similar contractual relationship with Platte County, should the Platte County authorities wish to open negotiations for contractual services, similar to those contracts currently in effect with the other governmental units mentioned [Tr. 309]. [Indeed, Mr. Reefer testified that some time ago, negotiations had been opened with the officials in Platte County for such contractual services but that those negotiations were broken off because of legal advice given to the Platte County officials by a former legal adviser of Platte County [Tr. 309–310].

While the question of the availability of the Municipal Correctional Institution of Kansas City, Missouri, was not directly presented in this case, the evidence adduced in this case suggested that such Institution, under an appropriate contractual working arrangement, might be available on either a short-term or long-term basis for the housing of persons charged with and convicted of State offenses in the Circuit Court of Platte County, Missouri. The reports in the public media to which we have made reference suggest that the Platte County officials may be under the impression that the Final Judgment and Decree of this Court forbids consideration of the Municipal Correctional Institution of Kansas City, Missouri, for use on either a short or long-term basis.

▇ Under the circumstances stated, considerations of equity require that this Court afford the parties an opportunity to seek a clarification of what may be a misunderstanding of the Final Judgment and Decree of this Court and if necessary, to seek such modification of the Final Judgment and Decree of this Court as the circumstances may require. Considerations of equity also suggest that if a reasonable period of time is needed to open and complete such negotiations with the City of Kansas City, Missouri, in regard to a possible use of the Municipal Correctional Insti-

tution of Kansas City, Missouri, that consideration be given to staying the execution of this Court's Final Judgment and Decree in order to afford the parties a reasonable period of time to conduct and complete such negotiations.

Accordingly, and for the reasons stated, it is

ORDERED (1) that within five (5) days the parties, or either of them, shall prepare, serve, and file an appropriate statement which shall indicate whether either side wishes a formal conference with the Court to discuss the questions above stated. It is further

ORDERED (2) that execution of the Final Judgment and Decree of this Court entered June 3, 1977 shall be stayed for the five day period above stated, in light of what may be a misunderstanding of defendants in regard to the limitations of the Final Judgment and Decree of this Court.

## EXTENSION OF STAY

On June 8, 1977 we entered an order staying the execution of the final judgment and decree of this Court entered June 3, 1977, for reasons stated in our memorandum opinion filed that day. Under another order entered the same day, we afforded the parties an opportunity to file an appropriate statement which would indicate whether either side desired a conference with the Court to clarify an erroneous impression apparently held by the defendants that the Jackson County Jail was the only institution in which persons charged or convicted of violations of law in Platte County, Missouri, could be confined during the transition period provided in this Court's final judgment and decree.

On June 10, 1977 this Court received a letter, dated June 9, 1977, from counsel for the defendants, which requested a conference with the Court to seek clarification of the final judgment and decree. Mr. Hull also advised the Court that it was his intention to contact the appropriate authority at the Municipal Correctional Institution of Kansas City, Missouri, for the purpose of

determining what sort of a contract might be negotiated with the appropriate authority at the Municipal Correctional Institution of Kansas City, Missouri in regard to housing inmates of the Platte County Jail.

In accordance with Mr. Hull's request, the Court held a conference with counsel for both sides on June 13, 1977. We have now received letters from counsel for the plaintiffs and from counsel for the defendants subsequent to that conference. Mr. Hull's letter of June 15, 1977 states that the defendants will continue to the best of their ability to attempt to comply with the final judgment and decree entered in this case. Plaintiffs' counsel Mr. Dittmeier's letter of June 15, 1977, suggests that the Court give consideration to the granting of an additional stay in the enforcement of Part I of the final judgment and decree in order to afford time for the appointment of the panel required under the final judgment and decree and for obtaining a report from that panel within a period not to exceed thirty days.

We have considered counsels' letters of June 15, 1977 in light of the procedural problems which are presented by defendants filing of a Notice of Appeal on June 13, 1977, and by defendants filing of an application for a stay pending appeal, also filed on June 13, 1977. Defendants' application for a stay pending appeal is governed by Rule 62(c) of the Federal Rules of Civil Procedure. That rule provides in substance that the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of an appeal from a final judgment granting an injunction on such terms as it considers proper under the circumstances of a particular case.

This Court most recently applied the principles which control this Court's exercise of discretion under Rule 62(c) in *Kansas City Royals v. Maj. League Baseball Players Assn.*, (W.D.Mo.1976) 409 F.Supp. 233, 263–271, affirmed 532 F.2d 615 (8th Cir. 1976). Those principles require that appropriate consideration must be given appellants' likelihood of success on the merits of the appeal, whether the defendant will suffer irreparable harm under the circumstances, whether a stay will harm any other party, and whether a stay would do no harm to the public interest.

As our discussion denying appellants' application for a stay pending appeal in the *K.C. Royals* case illustrates, determination of a Rule 62(c) applications for a stay pending appeal requires the most careful sort of consideration by the Court.

Defendant did not file any suggestions in support of the pending application for a stay pending appeal. The Court should not rule the questions presented by the defendants' pending application without affording the defendants a full and fair opportunity to support such application. The Court has been advised that counsel for the defendants will be out of the city until Monday, June 20, 1977.

Under the circumstances it is appropriate that the stay initially granted on June 8, 1977 be extended for an appropriate period of time in order to afford counsel for the defendants a reasonable opportunity to support defendants' present application for a stay pending appeal.

Accordingly, and on the Court's own motion, it is

ORDERED (1) that the stay of the execution of this Court's final judgment and decree entered June 3, 1977, granted on June 8, 1977, should be and is hereby extended until further order of court. It is further

ORDERED (2) that counsel for the defendants and counsel for the plaintiffs confer and arrange an appropriate time with this Court's law clerk at which time defendants' application for a stay pending appeal may be presented to the Court together with such supporting data as counsel for the defendants may wish to present in connection therewith.

### ON MOTION FOR STAY PENDING APPEAL

Pursuant to the Court's order entered June 16, 1977, counsel for the respective parties arranged for a conference with the Court which was held June 23, 1977.

The conference was a productive conference and reflected the consistent cooperation which counsel for the respective parties have extended to each other and this Court.

1. Counsel for defendants reported that negotiations have been opened and conducted with officials of Kansas City, Missouri, in regard to the interim housing of persons charged with offenses in Platte County, Missouri, and that, subject to formal order by the County Court of Platte County, Missouri, and by the City Council of the City of Kansas City, Missouri, it is to be reasonably anticipated that an appropriate contract for the housing of Platte County inmates in the Municipal Correctional Institution maintained by Kansas City, Missouri will likely be negotiated between those separate units of government.

2. Counsel for defendants stated to the Court that the population of the present Platte County Jail has been reduced to only two inmates at the present time. One inmate is awaiting transportation to serve a sentence in the State Penitentiary at Jefferson City, Missouri.

It is anticipated that the other inmate's case will be disposed of within the coming week and that the jail population of the present Platte County Jail will thus be reduced to zero.

3. Counsel for defendants have stated defendants do not intend to make any use of the tank portion of the present jail for any purpose during the interim period. Indeed, it is anticipated that the tank portion of the jail will likely be torn down in the near future to facilitate the remodeling of the Platte County Courthouse and the construction of the new jail facility.

4. Counsel for defendants stated to the Court that the Platte County officials do not intend to make any use of any portion of the old jail except that portion in which the cells in which juveniles and women were formerly confined and that this portion of the old jail will be used only as a pretrial detention holding facility for persons awaiting trial and for persons held during the period of a pending trial.

It is apparent that, absent exceptional circumstances, the intended use of this portion of the jail will not require the confinement of any person longer than the seven day period provided in the Final Judgment and Decree.

5. Counsel for the defendants stated to the Court that the portion of the jail which will be used for the purpose stated will not be put into whatever use for that purpose until the same has been properly cleaned and sanitized and the plumbing repaired and maintained in accordance with paragraph 2 of Part I of the Final Judgment and Decree.

6. Counsel for the defendants stated that appropriate arrangements will be made for the required predetention physical examination, the same to be made either at the jail or at the institutions in which the persons detained will be transferred under the circumstances. The remodeled facility will be appropriately inspected by health personnel and a report made within the time period required by paragraph 3 of Part I of the Final Judgment and Decree.

7. Counsel for the defendants also stated that defendants will continue to attempt to comply to the best of their ability with the other paragraphs of Part I of the Final Judgment and Decree during the interim period required by the construction of the new jail facility, including but not limited to the provision prohibiting the confinement of women and juveniles except for such period of time as may be necessary to arrange transportation to another facility.

8. Counsel for the plaintiffs stated to the Court that they recognized that the consummation of the above plans will effectively comply with and accomplish the purposes intended by Part I of the Final Judgment and Decree and eliminate any necessity for the appointment of a panel, as provided in Paragraphs 73 through 75 of Part III of the Final Judgment and Decree.

Under the circumstances above stated, the Court finds and concludes that the motion for stay discussed in our memorandum opinion of June 16, 1977 is mooted

and that it may be denied without prejudice as unnecessary under the circumstances.

It should further be stated that counsel for the defendants brought with them to the conference a revised set of the plans and specifications for the construction of the new jail. Those revised plans and specifications were reviewed at the conference. In light of the changes made in the original plans following an earlier conference with the Court, it is apparent that it is likely that an appropriate order may be made in the near future which will enable this Court to enter an order approving the revised plans and specifications for the construction of the new jail facility as being in compliance with standards mandated by the Constitution of the United States.

Counsel for the respective parties, however, need a reasonable period of time to consult further with the architects and other experts in order to be in a position to indicate their considered judgment in regard to the revised plans and specifications. An appropriate order will therefore be entered which will permit counsel to confer further with the architects and other experts so that the matter may be later considered by the Court in the near future.

The Court again commends counsel for the respective parties for their intelligent work in connection with this case and for their cooperation with each other and with this Court.

Accordingly, and for the reasons stated, it is

ORDERED (1) that defendants' motion for a stay pending appeal, filed June 13, 1977, may be denied without prejudice as moot. It is further

ORDERED (2) that counsel shall be afforded a reasonable time within which to further confer with architects and other experts and to thereafter arrange a further conference with the Court in order that the question of whether the revised plans and specifications for the construction of the new Platte County Jail may be approved as consistent with the standards mandated by the Constitution of the United States.